**In the Matter of the WELFARE of D.L.**

**No. C7–91–1173.**

Court of Appeals of Minnesota.

Dec. 31, 1991.

Review Granted Feb. 27, 1992.

Shane C. Perry, Shawn M. Perry, Stewart R. Perry, Perry, Perry & Perry, Wayzata, for appellants.

Michael O. Freeman, Hennepin County Atty., William A. Neiman, Nancy K. Jones, Asst. County Attys., Minneapolis, for respondent Hennepin County.

Robert L. Barrows, Steven L. Belton, Leonard, Street and Deinard, Minneapolis, for respondent Grandparents.

Hubert H. Humphrey, III, Atty. Gen., David P. Iverson, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Human Services.

Wright S. Walling, George T. Stephenson, Walling & Berg, P.A., Minneapolis, for Guardian Ad Litem.

Howard A. Knutson, Knutson, Stier, Ilstrup & Knutson, Burnsville, for amicus curiae NAACP.

Considered and decided by SCHUMACHER, P.J., and KLAPHAKE and DAVIES, JJ.

## OPINION

DAVIES, Judge.

D.L.'s foster parents and maternal grandparents both sought to adopt her. The foster parents appeal the trial court's ruling granting the grandparents' petition. We affirm.

## FACTS

D.L., whose birth date is July 12, 1989, was the third child born during the marriage of Debra L. and Jonathan L. D.L. has been in the care of appellants, her foster parents, since a few days after her birth. D.L., Debra, and the respondent grandparents are African–American; the foster parents and the father are not.

Debra did not give any information about her family to the agency that placed D.L. with appellants. She gave the agency a false address and failed to keep appointments with the agency social worker. Debra and Jonathan's parental rights to D.L. were terminated by the trial court's order on August 15, 1990, on the ground of abandonment.

Debra's two other daughters have lived with her parents, respondents herein, since 1988. One of the daughters is from the marriage with Jonathan and the other from a prior relationship. Respondents have legal custody of both girls, now six and eight years old. Another child of the marriage, a boy, lived with them for a time. At the request of both the boy and his father, respondents returned the boy to Jonathan.

Respondents live in rural Halifax County, Virginia. They first learned of D.L.'s existence in August of 1989 when Debra called from Minnesota and told them she had a daughter. Debra refused to give her parents any further information or a telephone number where she could be reached.

Debra visited respondents for a few days in late December 1989. They urged her to get the baby and live with them. Debra, however, returned to Minnesota and respondents had no contact with her until February of 1990, when they learned she was in jail in Minneapolis. Respondents called Debra who assured them that D.L. was with good people and she would get her back.

In June 1990, Debra called her mother to say for the first time that if she could not

get out of jail, she was going to lose D.L. Promptly thereafter, respondent grandmother came to Minneapolis to look for D.L.; she was able to locate her granddaughter through the placement agency. Within a few weeks respondents notified Hennepin County's adoption unit that they wished to adopt D.L.

Initially, Hennepin County advised respondents they could assume custody and take D.L. back to Virginia with them after a short transition period. However, on October 5, appellants, D.L.'s foster parents, filed a petition to adopt D.L. By order dated October 12, the trial court granted a temporary restraining order to prevent D.L.'s immediate removal from appellants' home.

On November 5, the trial court granted respondents' motion to intervene in the adoption proceeding initiated by appellants. Then on November 14, 1990, respondents filed their own petition to adopt D.L. An evidentiary hearing was set for January 1991. Prior to trial, the court issued an order limiting the hearing to the issue of whether there was good cause not to approve respondents as D.L.'s adoptive parents under the "relative" preference of the Minority Adoption Act, Minn.Stat. § 259.28, subd. 2.

At the seven-day trial, respondents provided a detailed description of their background, marriage, and family life. Respondent grandfather was age 51 and respondent grandmother was age 48 at the time of trial. They have been married since 1962. Both are in good health and are normally employed full time. The grandmother testified that she took a leave of absence from her job to pursue D.L.'s adoption and that she planned to stay at home to care for D.L. if the petition was granted.

Sandra Lawson, a Hennepin County social worker, testified pertaining to her favorable study of respondents' home. Lawson's testimony regarding the positive relationship between respondents and their children and grandchildren was confirmed by D.L.'s guardian ad litem, Jane Moore, who also visited respondents in Virginia.

We turn now to the appellants. They testified they have been married since 1966. Except for a teenage son, appellants' children are married and living away from home. Appellants testified they have a profound love for D.L. and that D.L. is deeply attached to them. A primary issue at trial was the consequences to D.L. of breaking the emotional bond between her and appellants.

Appellants presented the testimony of clinical psychologists, Drs. Winifred Scott and Clifford Moore; a pediatrician, Dr. Jeffrey Alexander; and a professor of child psychology at the University of Minnesota, Dr. Byron Egeland. These experts testified that removing a child of D.L.'s age from caretakers to whom the child is securely attached will cause permanent harm to the child which may result later in depressive or conduct disorders. All the experts agreed that a child D.L.'s age would experience short-term pain if the attachment with the primary caretaker was disrupted.

Respondents' primary expert was Kenneth Watson, a licensed clinical social worker and the Assistant Director of the Chicago Child Care Society. Watson testified he has been involved in thousands of adoptions involving toddler-aged children in his 37 years of experience. He stated that although children feel great pain if removed from caretakers to whom they are securely attached, the likelihood that the child will suffer any significant emotional problems is extremely small, given a loving recipient family. Watson testified about the advantages to the child of placement within the biological family. He also testified that African–American parents have a unique ability to pass along to their children the coping skills needed for a minority person to manage in this society.

Respondents also called Dr. Lawrence Kutner, a clinical psychologist, as a rebuttal witness. Kutner testified that although attachment is important, the impact of early separation can fade away with the opportunity to form new positive attachments.

The trial court granted respondents' adoption petition, making extensive find-

ings of fact. The court upheld the constitutionality of the Minority Adoption Act and found there was no good cause not to follow the relative placement preference of the Act. The court also made a separate finding that it was in D.L.'s best interest that respondents become her adoptive parents.

This appeal followed. Pursuant to orders of this court, D.L. has remained in appellants' home during the pendency of the appeal.

### ISSUES

1. Does the Minority Adoption Act, Minn.Stat. § 259.28, subd. 2, violate the 14th Amendment's Equal Protection Clause by limiting mandatory placement preferences to children of minority racial or ethnic backgrounds?

2. Did the trial court abuse its broad discretion in concluding that the child's best interests were served by placing her for adoption with her maternal grandparents?

### ANALYSIS

The trial court's authority to grant an adoption petition is governed by Minn.Stat. § 259.28 (1990). The statute provides that a decree of adoption shall be made if the court finds that it is in "the best interests of the child." Minn.Stat. § 259.28, subd 1(a).

### I.

The Minority Adoption Act, codified at Minn.Stat. § 259.28, subd. 2, requires the court, in the absence of good cause to the contrary, to follow certain placement preferences in the adoption of a child of "minority racial or minority ethnic heritage." *Id.* In determining adoptive placement of such children, the court "shall" give preference first to a relative of the child, or, if that would be "detrimental" to the child or a relative is not available, to a family with the same racial or ethnic heritage as the child. *Id.* If such a placement is not "feasible," the court shall give preference to a family of different racial or ethnic heritage from the child that is "knowledgeable and appreciative" of the child's racial or ethnic heritage. *Id.*

Appellants contend that Minn.Stat. § 259.28, subd. 2, impermissibly classifies adoptive children based upon their race, thereby violating the 14th Amendment's Equal Protection Clause. Appellants are joined in this argument by D.L.'s guardian ad litem and amicus curiae Suburban NAACP. Respondents grandparents and Hennepin County contend that appellants lack standing to challenge the statute and further argue that the statute withstands equal protection strict scrutiny analysis.

To invoke the jurisdiction of the court, when the constitutionality of a statute is challenged, the litigant bringing the challenge must be able to show that the statute has been or is about to be applied to his or her disadvantage. *St. Paul Area Chamber of Commerce v. Marzitelli,* 258 N.W.2d 585, 588 (Minn.1977). In this case, appellants were aggrieved by the trial court's application of the relative preference under Minn.Stat. § 259.28, subd. 2. We find appellants have standing to challenge the constitutionality of the statute.

A core purpose of the 14th Amendment is to do away with all governmentally imposed discrimination based on race. *Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421 (1984). To pass constitutional muster, racial classifications are subject to the most exacting scrutiny, that is, they must be justified by compelling governmental interest and must be "necessary * * * to the accomplishment" of their legitimate purpose. *McLaughlin v. Florida,* 379 U.S. 184, 196, 85 S.Ct. 283, 290–91, 13 L.Ed.2d 222 (1964). The "strict scrutiny" test applies even to "benign" or "remedial" race-based classifications prescribed by state and local governments. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490–91, 109 S.Ct. 706, 719–20, 102 L.Ed.2d 854 (1989).[1]

---

1. Race-conscious classifications adopted by *Congress* to address racial and ethnic discrimination are subject to a more lenient standard—they must only serve an important governmental ob-

■ On its face, Minn.Stat. § 259.28, subd. 2, establishes a racial classification by requiring, in the adoptive placement of a child of minority racial or ethnic heritage, that the trial court follow certain preferences not required for non-minority children. The statute recites a benevolent purpose for the classification, that is, "to ensure that the best interests of children are met by requiring due consideration of the child's minority race or minority ethnic heritage." *Id.*

The racial classification here fails, however, because it is not necessary to the accomplishment of the legislative purpose. The heritage of minority children can be protected without the classification by making the preferences for relatives applicable to *all* children, as the legislature has directed in related statutes. *See, e.g.,* Minn.Stat. § 259.255 (child placing agency shall give preference to relatives in placing "the child" in adoption placements); Minn.Stat. § 260.181, subd. 3 (court shall follow preferences for relatives in transferring legal custody of "any child").

We are mindful that this court exercises the power to declare a statute unconstitutional only when absolutely necessary. *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 788 (Minn.1989). In assessing the constitutionality of a racial classification, we must consider the availability of an alternative remedy. *Croson*, 488 U.S. at 507, 109 S.Ct. at 728. Because giving the relative racial preferences in the adoption of all children would achieve the same result in a racially neutral manner, we find that restriction of these preferences to children of minority racial and ethnic background alone as specified under Minn.Stat. § 259.28, subd. 2, is unconstitutional under the 14th Amendment's Equal Protection Clause.

## II.

■ The trial court's decision to grant an adoption petition is reviewed under an abuse of discretion standard. *In re Jordet,*

248 Minn. 433, 443, 80 N.W.2d 642, 648 (1957).

In view of our decision that the Minority Adoption Act is unconstitutional, respondents are not entitled to a mandatory preference under that statute. There is, however, both longstanding common law which favors providing "custodial preference to near relatives," *In re M.M.,* 452 N.W.2d 236, 238 (Minn.1990), and a strong legislative policy of awarding "the permanent care and custody" of a child to a relative. *Id.; see* Minn.Stat. § 257.02 (1990). The legislature has emphasized the importance of preserving the biological family, *see* Minn.Stat. § 256F.01 (1990), and, if necessary, transferring legal custody or guardianship to a relative, Minn.Stat. § 260.181 (1990).

Basically the same language regarding a preference for relatives which appears in Minn.Stat. § 260.181, dealing with custody or guardianship, appears in Minn.Stat. § 259.255 (1990), which deals with the duties of the child placement agency in an adoption. While both of these statutes contain purpose clauses which mention concern for minority race and ethnic heritage, the operative language of each is neutral and refers to "placing the child with * * * a relative," Minn.Stat. § 259.255, or placing "the child * * * in the legal custody or guardianship of * * * [a] relative," Minn. Stat. § 260.181. The purpose clauses do not make the operative language of these two provisions invalid.

Our supreme court has recognized a common law doctrine which, although not as compelling as the right of a parent to custody of a child, accords a custodial preference to other near relatives, as opposed to strangers. *In re M.M.,* 452 N.W.2d at 238. This is based on the common sense notion that those near of kin will be disposed to do more for the welfare of the child and to advance his or her interests than those who lack the prompting of kinship. *State, ex rel. Waldron v. Bienek,* 155 Minn. 313, 315, 193 N.W. 452, 452–53 (1923).

jective and be substantially related to the achievement of that objective. *Metro Broadcast-* *ing, Inc. v. FCC,* —— U.S. ——, 110 S.Ct. 2997, 3009, 111 L.Ed.2d 445 (1990).

■ Appellants and the dissent argue that there is no preference under the common law for *adoptive* placement with near relatives. This is understandable, for legal adoption is wholly statutory and was unknown to the common law. *See In re Kure,* 197 Minn. 234, 236, 266 N.W. 746, 747 (1936). Appellants also point out that our supreme court has affirmed a trial court's order granting the foster parents' petitions to adopt and denying the maternal grandmother's petition. *In re Niskanen,* 301 Minn. 53, 223 N.W.2d 754 (1974).

In a subsequent decision, however, the court noted *Niskanen* as an exception to "the traditional preference to be accorded prospective custodians who are also blood relatives of the child." *In re Doege,* 308 Minn. 104, 109, 240 N.W.2d 562, 564 (1976). The same reasons underlying the common law preference for near relatives as custodians apply with at least equal force when the question becomes one of appropriate placement for adoption.

It is clear from the cumulative legislation addressing child custody, that "the legislature has strongly endorsed the societal goal of strengthening and preserving the biological family structure." *In re M.M.,* 452 N.W.2d at 238. Further, an award of custody to a relative enhances his or her ability to prevail in a subsequent adoption proceeding. Thus, by codifying the common law *custodial* preference for near relatives, the legislature could be said to have indicated that the biological family is also favored for *adoptive* placement. *See id.* (strong preference to award permanent care and custody of a child to a relative if natural parents are unable to perform that responsibility).

The circumstances here illustrate why courts and legislatures have had little reason to make more explicit the adoptive preference for relatives that common sense suggests. The mother here voluntarily turned over to her parents the two older siblings for long-term custody (or de facto adoption). The occasion for a termination of her parental rights to those children and their placing for adoption thus never arose.

In fact, the record indicates the issue would not have arisen in this case had appellants not filed their petition for adoption. Hennepin County had advised respondents that they could assume custody and take D.L. to Virginia with them. Only at that point did appellants file a petition for adoption and only after that did respondents file their own petition to adopt D.L.

■ Further, independent of the preference in Minn.Stat. § 259.28, subd. 2, which we find unconstitutional, the appropriate test for a proposed adoptive placement is whether it would serve "the best interests of the child." Minn.Stat. § 259.28, subd. 1(a). We are able to affirm the result in this case because the record supports the trial court's separate independent conclusion that D.L.'s adoptive placement with her grandparents is in her best interest.

Appellants urge that the removal of D.L. from their care will permanently harm her because of the disruption of the primary caretaker bond. The experts agreed, and the trial court found, that D.L.'s separation from appellants will cause her severe short-term pain. Based on the testimony of Kenneth Watson, however, the trial court found that the injury will heal well in the loving environment provided by the grandparents. We cannot say the trial court abused its discretion in resolving the conflicting expert testimony on this issue. *See In re J.M.G.,* 376 N.W.2d 494, 498 (Minn. App.1985), *pet. for rev. denied* (Minn. Jan. 17, 1986) (where opinions of experts conflict, the finder of fact is to determine the more credible and acceptable view).

We recognize the importance for young children of maintaining continuity with the primary caretaker. *See Maxfield v. Maxfield,* 452 N.W.2d 219, 223 (Minn.1990) (child's bond with the primary parent should not be disrupted without strong reasons). In other contexts, however, the severance of such a bond has not been held to be the overriding consideration in determining the best interests of the child. *See Wallin v. Wallin,* 290 Minn. 261, 267, 187 N.W.2d 627, 631 (1971) (disruptive effect of custody change not sufficient to prevent parent from prevailing in custody dispute

with nonparent); *State, ex rel. St. Louis County Welfare Dept. v. Niemi*, 284 Minn. 225, 232, 169 N.W.2d 758, 762 (1969) (painful transition from foster parents to natural parents may be compensated by ultimate benefit for the child in growing up in the natural family).

█ In summary, the trial court, in this unusual circumstance, properly should consider statutes related both to adoption and to transfer of legal custody and the common law preference for maintaining the child within the biological family in determining whether to grant an adoption petition. In this case, the record supports the trial court's findings of significant benefits to D.L. from placement with her grandparents. These include the opportunity to grow up with her two siblings and the support of a closely-knit extended family. We cannot say the trial court erred in concluding that the temporary pain D.L. will suffer due to her separation from appellants is outweighed by the long-term advantages of placement in the grandparents' home.

### III.

Appellants raise three other issues that require brief discussion.

1. Appellants argue the trial court erred in refusing to consider their petition, even though it was filed prior to the grandparents' petition. We disagree.

█ Minnesota Statutes, chapter 259, does not provide specifically that the court may accord one adoption petition a procedural preference over a competing petition. Still, adoption statutes are to be liberally construed to accomplish their purpose, and there need not be more than a substantial compliance with their requirements to sustain validity of the adoption proceedings. *Jordet*, 248 Minn. at 439, 80 N.W.2d at 646. The trial court has discretion to focus on the more likely petition in the interest of avoiding a lengthy and contentious proceeding. *See* Minn.R.Civ.P. 42.01 (when actions involving a common question of law or fact are pending before the court, it may make such orders con-

cerning proceedings therein as may tend to avoid unnecessary cost or delay).

2. In their post-trial motions, appellants argued they were entitled to a new trial because of trial court bias. This claim is based primarily on an opinion piece written by the trial judge for a local newspaper pertaining to the difficulties white Minnesotans have in understanding other cultures.

█ A judge may not preside in a case if he or she has an interest in its determination or if he or she might be excluded for bias. Minn.R.Civ.P. 63.02. Bias or prejudice, to be disqualifying, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from her participation in the case. *In re Estate of Lange*, 398 N.W.2d 569, 573 (Minn.App.1986). Here, the trial judge's general comments in the newspaper article were unrelated to the merits of this case. The record does not sustain a determination of bias warranting a new trial.

█ 3. Appellants also argue the trial court erred in allowing the surprise rebuttal testimony of Dr. Kutner. This testimony was cumulative, however, and its rejection would not have affected the outcome. The trial court did not abuse its discretion in denying a new trial on this ground. *Sward v. Nash*, 230 Minn. 100, 109, 40 N.W.2d 828, 833 (1950) (new trial should be granted only if there is a strong probability that it will render a different result).

### IV.

In an order dated April 24, 1991, this court stayed transfer of D.L. from appellants' home until final resolution of all trial court and appellate proceedings. Respondents' request to rescind the stay at this time is denied. The stay remains in effect until this court's decision becomes final. *See* Minn.R.Civ.App.P. 136.02.

### DECISION

By imposing different criteria for adoptive placement of children of minority racial or ethnic backgrounds, as opposed to

non-minority children, Minn.Stat. § 259.28, subd. 2, violates the 14th Amendment's Equal Protection Clause. Although application of the relative preference under the statute was impermissible, we affirm the result in this case based on longstanding legislative and common law preferences for placing a child in the permanent care and custody of a relative and on the trial court's separate conclusion that the child's best interests are served by placement with her grandparents. The trial court did not abuse its broad discretion in concluding that the temporary harm to D.L. resulting from her separation from appellants is outweighed by the significant benefits of placement within her biological family.

Affirmed.

SCHUMACHER, Judge (dissenting).

I agree that Minn.Stat. § 259.28, subd. 2 creates an impermissible racial classification and is unconstitutional. I disagree with the majority's affirmance of the result in this case on the ground that the trial court conducted an alternate "best interests" analysis. In fact, the proceedings were limited to whether there was "good cause" not to apply the relative preference under the statute we have now found unconstitutional. Because the trial court's refusal to consider appellants' petition resulted in the exclusion of certain evidence and the skewing of the weight afforded to other evidence, a new trial is necessary. I therefore respectfully dissent.

1. The majority concludes the trial court acted within its discretion in choosing to entertain only the petition of respondent grandparents. I disagree. In this case, appellants' petition was filed first. The grandparents were allowed to intervene in the proceeding to consider *appellants'* petition. Despite this posture, the trial court issued an order only a few days before trial limiting the evidence to the issue of whether there was good cause not to grant the *grandparents'* petition.

By preliminarily barring evidence in support of appellants' petition, the trial court rendered it impossible to make a reasoned determination of D.L.'s best interests

based on all of the relevant evidence. Moreover, the trial court's focus on whether there was good cause not to place D.L. with her grandparents may well have affected the court's evaluation of critical evidence on the effect of the disruption of the primary caretaker bond. The experts agreed that D.L. will be psychologically damaged if removed from appellants' care, but disagreed as to the likelihood of long term damage. The evidence respondents presented that D.L. will not be permanently harmed would be of less weight in an inquiry where her best interests is the only issue.

2. Further, I disagree with the majority's conclusion that there is a "common law" preference for near relatives in adoption proceedings. The power to decree an adoption is purely statutory and the statute is the measure of the court's authority. *In re Jordet*, 248 Minn. 433, 439, 80 N.W.2d 642, 646 (1957). Without statutory authorization, no preference for near relatives may be applied.

The majority seeks to extend the common law preference *for near relative placement in custody proceedings* to adoption proceedings. The common law custody preference fostered the goal of preserving the family unit while parental rights continued. The adoption statute, by contrast, seeks to provide a permanent family relationship for children only after the biological parents' rights have been terminated. To achieve this purpose, the act severs all biological relationships and creates a new parent/child relationship with a new family and new relatives. *See* Minn. Stat. § 259.29, subd. 1 (1990).

Accordingly, our supreme court has not recognized a near relative preference in adoption proceedings. *See In re Niskanen*, 301 Minn. 53, 55, 223 N.W.2d 754, 756 (1974) (in adoption contest between foster parents and grandmother, no presumption such as that in favor of a natural parent is applicable to any of the petitioners, since parental rights have been terminated). The majority's attempt in this case to construct a nonstatutory relative adoptive

preference is contrary to the clear import of *Niskanen.*

In summary, the trial court explicitly limited the proceedings here to the issue of whether the statutory relative preference should apply. Our determination that the standard on which the trial court relied is unconstitutional compels a remand for consideration under a true "best interests" standard. Although I recognize the need for certainty for D.L., the importance of determining her permanent home based on *all* the relevant evidence and according to the proper standard justifies the delay that would be caused by further proceedings. I would reverse and remand for a new trial.