**In the Matter of the WELFARE OF D.L.**

No. C7–91–1173.

Supreme Court of Minnesota.

June 12, 1992.

Stewart R. Perry, Shawn M. Perry, Shane C. Perry, Perry, Perry & Perry, Wayzata, for appellant.

Michael O. Freeman, Hennepin County Atty., William A. Neiman, Nancy K. Jones, Asst. County Attys., Minneapolis, for Hennepin County.

Robert Lewis Barrows, Steven L. Belton, Leonard, Street & Deinard, Minneapolis, for grandparents.

Wright S. Walling, George T. Stephenson, Walling & Berg, P.A., Minneapolis, for guardian ad litem.

Hubert H. Humphrey, III, Atty. Gen., David P. Iverson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Dept. of Human Services.

Howard A. Knutson, Knutson, Stier, Ilstrup & Knutson, Burnsville, for NAACP, amicus curiae.

GARDEBRING, Justice.

This case involves the adoption of 2-year-old D.L., who has lived with her foster parents since four days after her birth in July 1989. The foster parents and D.L.'s maternal grandparents both filed petitions to adopt the child after the parental rights of D.L.'s natural mother and father were terminated. The trial court granted the grandparents' petition, based on the family preference for adoption of minority children expressed in Minn.Stat. § 259.28, subd. 2 (1990).[1] The court of appeals held the statute unconstitutional, but affirmed the trial court's result, based on a common-law preference for family placements. *In*

---

1. Under Minn.Stat. § 259.28, subd. 1(a), an adoption decree shall be granted "if the court finds that it is in the best interests of the child." Minn.Stat. § 259.28, subd. 2. Subdivision 2 provides in pertinent part:

> The policy of the state of Minnesota is to ensure that the best interests of children are met by requiring due consideration of the child's minority race or minority ethnic heritage in adoption placements. * * *
> In the adoption of a child of minority racial or minority ethnic heritage, in reviewing

adoptive placement, the court shall consider preference, and in determining appropriate adoption, the court shall give preference, in the absence of good cause to the contrary, to (a) a relative or relatives of the child, or, if that would be detrimental to the child or a relative is not available, to (b) a family with the same racial or ethnic heritage as the child * * *.

*Minn.Stat. § 259.28, subd. 2.*

re D.L., 479 N.W.2d 408, 412–15 (Minn.App. 1991).

The briefs and oral argument in this case reflect careful legal research and thoughtful analysis. But the court is also mindful that this is not a case about the meaning of an insurance policy or the interpretation of a statute; it is about a child, much loved by two families, each prepared to raise her with care and devotion, one of whom will be enriched and delighted by her presence in their home, and the other of whom will be deprived of the joy she gives. As a court, we must be guided by abstract legal principles, but in this case, we have attempted to apply the wisdom of our hearts, as well.

We affirm the decisions of the lower courts, and conclude that D.L. be placed for adoption in the home of her grandparents, consistent with the order of the trial court of April 19, 1991. We do not reach the constitutional issue because, whether or not the particular scheme of Minn.Stat. § 259.28 is valid, a strong preference for family placement is well established in Minnesota law. The touchstone of our analysis, as always, is the best interests of the child, and consistent with that principle, we hold today that adoptive placement with relatives is presumptively in a child's best interests, unless good cause to the contrary or detriment to the child are shown.

D.L. was born July 12, 1989, the daughter of an African–American mother. D.L.'s parents separated in 1988. Shortly thereafter, D.L.'s mother left her other three children with her parents in Virginia. D.L.'s mother returned to Minnesota and maintained only sporadic contact with her parents thereafter.

At birth, D.L. was released by her mother to a foster care and adoption agency. Four days later, D.L. was placed with her foster parents, who are Caucasian. The placement agency was unable to find D.L.'s extended family because the mother provided false information and did not maintain contact with the agency. In September 1989, D.L.'s grandparents, who are African–American, first learned that D.L. had been born and placed in foster care. The child's mother refused to provide any further information to them. In February 1990, the grandparents learned that D.L.'s mother was in jail in Minneapolis. In July 1990, D.L.'s mother told her parents that she was in danger of losing custody of D.L. D.L.'s grandmother came to Minnesota, determined her whereabouts and made inquiries to a foster care social worker about seeing the child.

On August 16, 1990, the Hennepin County Juvenile Court terminated the parental rights of D.L.'s mother and father. The child became a ward of the state and remained in the custody of the foster parents. The child's grandmother indicated to county social workers that she and her husband wanted to adopt D.L. The county began to develop a permanent placement plan for D.L., and determined that they should try to place her with her grandparents, in compliance with the preference expressed in Minn.Stat. § 259.28, subd. 2. Upon learning that D.L.'s grandmother was seeking to take the child back to Virginia, the foster parents sought and received a temporary restraining order. The trial court found that the county had not adequately considered whether moving D.L. would needlessly disrupt her attachment to her foster parents when her ultimate placement was uncertain.

On October 5, 1990, the foster parents filed a petition to adopt. The grandparents filed their petition on November 8, and were granted reasonable visitation with the child. With the assistance of the county, they began visiting the child frequently. Hennepin County social workers, along with their counterparts in Virginia, conducted a study of the grandparents' home, and recommended that the grandparents' adoption petition be granted. The trial court invoked Rule 42.02, Minn.R.Civ.P.[2] to consider the grandparents' petition first,

---

**2.** The rule provides: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of one or any number of claims, cross-claims, counterclaims, or third-party claims, or of any separate issues." Minn.R.Civ.P. 42.02.

reasoning that only if it found good cause not to follow the statutory family preference, would it need to reach other issues; thus the only issue litigated was whether there was good cause not to invoke the preference. The foster parents were allowed to participate in the proceeding as intervenors, but their role was limited to presenting evidence on the issue of good cause.

At trial, the evidence showed that the grandparents are in good health and that their home life is financially and emotionally stable. The evidence further showed that the grandparents have six children, two of whom remain at home: a 17–year-old daughter and a 9–year–old son. The grandparents also have legal and physical custody of D.L.'s sisters. D.L.'s brother is presently living with his father.

The key issue at trial was the severity of any trauma D.L. might experience by being moved from the foster home to her grandparents' home. All six experts testified that breaking the bond that has developed between D.L. and her foster parents would cause some harm because they are the only parents D.L. has known. However, there was disagreement among the six experts as to the permanency of the harm. The experts testifying on behalf of the grandparents indicated that any damage would be temporary and that the child's sense of loss would diminish as new attachments are formed.

The trial court credited that view and found, among other things, that the trauma of breaking the primary attachment is temporary and heals well in most cases; that the trauma of being moved from one good home to another is likely to be reflected in the child's conduct for up to 180 days; that a child who has formed a healthy attachment to a primary caretaker is likely to be able to form a subsequent good attachment to a different caretaker; that the likelihood of significant emotional harm from moving a securely-attached child from one good home to another is small, and that the

temporary pain of separation from the foster family does not outweigh the lifelong advantages of living with a child's natural family. The trial court concluded that there was no good cause not to apply the statutory family preference, and that it would not be detrimental to D.L. to be adopted by her grandparents. The order for adoption by the grandparents was granted on April 19, 1991. The trial court ordered that the temporary restraining order against removal of D.L. from the foster home be lifted, but the court of appeals reinstated the temporary restraining order, pending "final resolution" of the case.

On May 7, the foster parents filed a motion for amended findings, conclusions and order for judgment or a new trial, plus a motion for the trial judge to recuse, based on arguments that (1) the findings were not supported by the evidence; (2) the conclusions were not supported by law; and (3) there were irregularities which deprived appellants of a fair trial, including bias by the trial court. Particularly bothersome to appellants was a June 1990 newspaper essay[3] in which the judge wrote, among other things:

> [T]he vast majority of white Minnesotans unthinkingly accept white culture as the norm—indeed, as the whole of reality. To such radical ethnocentrics, people of color are forever too weak (they "can't" act white, i.e. "normal") or too scary (they won't act white). Whites who want not to be racist expend huge effort trying to be clear and fair in their understanding of people of color, so as to help colored people transform themselves into a reasonable facsimile of white people. What we really must do is see that we, in our unexamined whiteness, are the problem. We should use our energy better, use it to understand how we have constructed an America that vests unearned power and privilege in whites.

Star Tribune, June 21, 1990, at 21A, col. 2.

The trial court denied all of the appellants' post-trial motions. A divided court

3. Trial counsel for the foster parents submitted an affidavit in which he stated that he did not learn of the newspaper article until after trial.

of appeals panel affirmed the trial court's result, though not its reasoning. *In re D.L.*, 479 N.W.2d at 412–15. All three members of the panel held that Minn.Stat. § 259.28, subd. 2 violates the equal protection clause of the 14th amendment. *Id.* at 413, 416. The majority nonetheless upheld the trial court's decision on the grounds that longstanding legislative and common-law preferences for placement with family members leads to the same result. *Id.* at 413–15. The dissent contended that because adoption is a statutory invention, there is no common law of adoption. The dissent would have remanded for a new trial solely on a "best interests of the child" analysis. *Id.* at 416–17. The court of appeals also held that the trial court did not abuse its discretion in initially considering only the grandparents' petition and that the judge's newspaper essay did not reflect improper bias. *Id.* at 415.

■ One of the questions raised on appeal is whether Minn.Stat. § 259.28, subd. 2 violates the equal protection clause of the 14th amendment by establishing a family preference only for adoption of minority children. We do not believe it is necessary to reach that issue. Statutes are presumptively constitutional. *See State v. Hamm*, 423 N.W.2d 379, 380 (Minn.1988); *In re Tveten*, 402 N.W.2d 551, 556 (Minn. 1987). This court's power to declare a statute unconstitutional should be exercised "only when absolutely necessary and with extreme caution." *In re Estate of Turner*, 391 N.W.2d 767, 769 (Minn.1986).

We need not reach the constitutional issue because we conclude that a strong family preference exists for *all* child placements, without regard to race or ethnic heritage. The court of appeals majority relied on the common law of adoption. The dissenting judge and the foster parents contend that there is no such thing. That debate is semantically provocative but legally unhelpful. Adoption is a creation of statute, so there is no line of cases stretching back to 17th century England. To that

extent, there is no common law of adoption. *See In re Kure*, 197 Minn. 234, 236, 266 N.W. 746, 747 (1936). But that does not mean that the courts are relegated to a passive role in adoption issues. While the power to decree an adoption is purely statutory, and the statute is the measure of the court's authority, "[a]doption statutes are to be liberally construed to accomplish their purpose, and there need not be more than a substantial compliance with their requirements to sustain the validity of adoption proceedings." *In re Jordet*, 248 Minn. 433, 439, 80 N.W.2d 642, 646 (1957). Further, it is clear that the judicial branch has an independent interest, and significant independent authority, to guard the welfare of children who are wards of the state after parental termination.

Whether or not Minn.Stat. § 259.28, subd. 2 is constitutional, there is no question that subd. 1(a) is valid, and it states that adoption petitions are to be granted if doing so is in the best interests of the child. "Best interests of the child" is not defined in the adoption statute,[4] but it is well-established in this state that the courts have independent authority to determine a child's "best interests." As we said nearly 100 years ago in a slightly different context, legislative enactments on the placement of children are not "beyond the control of the courts. The cardinal principle in such matters is to regard the benefit of the infant as paramount * * *." *State ex rel. Flint v. Flint*, 63 Minn. 187, 189, 65 N.W. 272, 273 (1895). For additional discussion of the courts' great interest in the welfare of children, *see State ex rel. Larson v. Halverson*, 127 Minn. 387, 389, 149 N.W. 664, 665 (1914); *In re Anderson*, 235 Minn. 192, 197, 50 N.W.2d 278, 283–86 (1951); *State ex rel. Waldron v. Bienek*, 155 Minn. 313, 315–16, 193 N.W. 452, 452–53 (1923); and *Jordet*, 248 Minn. at 441; 80 N.W.2d at 646–47.

■ In the courts' efforts to identify and promote the best interests of children, we have repeatedly noted our strong prefer-

---

**4.** The legislature has defined the term in two places: at Minn.Stat. § 257.025, regarding custody disputes, and Minn.Stat. § 518.17, regarding marital dissolutions, but neither of those provisions is controlling.

ence for permanent placement of children with relatives. As we said only two years ago:

> It has long been a familial phenomenon that the absence, inability or incapacity of the natural parents to provide and care for their children has prompted other relatives to step forward to assume the benefits and responsibilities of that role. While at one time, judicial intervention was unnecessary, a body of common law developed according a custodial preference to near relatives.

*In re M.M.,* 452 N.W.2d 236, 238 (Minn. 1990). Nothing in the present case has persuaded us that this common law principle favoring placement with family members should be abandoned now. Accordingly, we hold today that adoptive placement with a family member is presumptively in the best interests of a child, absent a showing of good cause to the contrary or detriment to the child.

This decision does no more than restate the policy of all three branches of state government. The legislative family preference expressed in Minn.Stat. § 259.28, subd. 2 is also articulated in other statutory provisions. *See, e.g.,* Minn.Stat. § 257.02 (permanent care and custody); Minn.Stat. § 257.071, subds. 1 and 1a (foster placements); Minn.Stat. § 260.011, subd. 2(a) (preference for in-home placement under the Indian Child Welfare Act); Minn.Stat. § 260.191, subd. 1a(d) (children in need of protection); Minn.Stat. § 256F.01 (permanency planning); and Minn.Stat. § 260.181, subd. 3 (dispositions). In the most recent session of the legislature, it further indicated its strong belief in a family preference with the passage of 1992 Minn.Laws, chapter 557, which was signed by the governor on April 27, 1992, and took effect April 28, 1992. That bill amends several statutes, including the one at issue in this case, to apply a relative

preference in *all* adoptions and foster care placements, regardless of the child's race. Act of April 17, 1992, ch. 557, 1992 Minn. Laws ——. Besides the governor's approval of 1992 Minn.Laws, chapter 557, the executive branch's preference for family placements is evident in Minn.R. 9560.0040, subp. 3, adopted by the Minnesota Department of Human Services, which directs placement agencies to make "special" efforts to recruit related individuals to become adoptive parents. Minn.R. 9560.0040, subp. 3.

■ This intergovernmental consensus reflects the common-sense notion that blood relatives are most likely to look out for one another's interests, through good times and bad.

> Recognizing that those near of kin will be disposed to do more for its welfare and to advance its interests than those who lack the prompting of kinship, preference is given to near blood relatives, unless the situation disclosed indicates that it may be of advantage to the child to be placed in other hands.

*Bienek,* 155 Minn. at 315, 193 N.W. at 452–53.[5]

■ Our holding does not mean that relatives' adoption petitions must be granted automatically. The terms "best interests," "good cause to the contrary" and "detriment" do not lend themselves to standardized definitions. The best interests of potential adoptees will vary from case to case, and the trial court retains broad discretion because of its opportunity to observe the parties and hear the witnesses. *See Jordet,* 248 Minn. at 442–43, 80 N.W.2d at 648. In exercising that discretion, a trial court must make detailed factual findings showing that the child's best interests are being served. But the nature of those findings is not subject to a precise formula

---

5. For purposes of applying this relative preference, we conclude that a child's legal relationship with his or her siblings, grandparents and other close relatives continues independent of the termination of the natural mother's and father's parental rights. *See In re M.M.,* 452 N.W.2d at 236 (grandmother treated as relative after parental rights of child's mother terminat-

ed). To hold otherwise would be to allow the application of the family preference to turn on the timing of the grandparents' petition to adopt, relative to the termination of parental rights. This seems to us arbitrary and inconsistent with the "best interests of the child" analysis.

because they will vary according to the fact situation.

In this case, the trial court did not employ the exact analysis we have set out today, but after a careful review of the record we find substantial support for the trial court's conclusions. The trial court made findings on the grandparents' health, their emotional and financial stability, the nurturing environment of their home, the presence in the home of D.L.'s two sisters, and the grandparents' willingness to supply the love and comfort D.L. will need in this transitional period of her life. In addition, there was no good cause shown why adoption by the grandparents would not be in D.L.'s best interests. The fact that separation from her foster parents will be initially painful to D.L. is not good cause to defeat the family preference. *See Wallin v. Wallin*, 290 Minn. 261, 267, 187 N.W.2d 627, 631 (1971).

We share the trial court's belief that the benefits of a close relationship with blood relatives is in D.L.'s long-term best interests, justifying any temporary pain that this separation will bring. In reaching this conclusion, we recognize that the result might be understood to be at odds with *In re Niskanen*, 301 Minn. 53, 223 N.W.2d 754 (1974). In *Niskanen*, we upheld a trial court's rejection of a grandmother's adoption petition in favor of the petitions of her two grandchildren's foster parents. *Id.* at 54–56, 223 N.W.2d at 755–56. We believe that the result in *Niskanen* can be reconciled with our analysis today on the basis that on the particular facts of that case there was good cause not to apply a family preference. For example, the court there was influenced by the fact that the grandmother was over 60 years of age, was a widowed single parent and had experienced difficulty in parenting her own children. *See id.* These facts, relevant to "good cause," are not present in this case. But to the extent that *Niskanen* is inconsistent with today's holding, it is overruled.

Having held that the best interests of a child are presumptively served by adoptive placement with a relative, we next turn to the proper procedure for applying this rule. In this case, the trial court chose to consider only the grandparents' petition in the initial proceeding. We hold that such a procedure is not required, but it is permissible, in the discretion of the trial court. When a presumption exists in favor of one petitioner over another, and there is no reason to believe that the favored petitioner will not prevail, judicial time and litigants' resources can be conserved by a single proceeding. If no petitioner has the benefit of a relative preference, or if more than one petitioner is related to the child, it might well be necessary to consider multiple petitions in the same proceeding. But when it is not necessary, it is not encouraged. *See Wilson v. Barnett*, 275 Minn. 32, 35, 144 N.W.2d 700, 702 (1966). Furthermore, in this case appellants made no offer of proof at trial and on appeal have identified no relevant evidence which the trial court excluded. In light of the family preference, there is nothing in the record to suggest any prejudice to the appellants from the procedure adopted by the trial court.

The foster parents also have raised questions about certain evidentiary rulings and potential bias on the part of the trial judge. We find these claims to be without merit. The only significant evidentiary issue was a state senator's testimony about the legislative intent behind Minn. Stat. § 259.28, subd. 2, which she authored. It is well established that a lone legislator is not competent to testify about the intent of a statute, even if she or he authored it. *See O'Laughlin v. Barton*, 582 N.E.2d 817, 821 (Ind.1991); *Jackson v. Delk*, 257 Ga. 541, 361 S.E.2d 370, 372 (1987); *Ruthven Consol. Sch. Dist. v. Emmetsburg Community Sch. Dist.*, 382 N.W.2d 136, 140 (Iowa 1986). *See also Delaney v. Superior Court of Los Angeles*, 50 Cal.3d 785, 268 Cal.Rptr. 753, 789 P.2d 934, 943 n. 12 (1990). Under this rule, the senator's testimony was inadmissible, but the point is moot because we have not used the statute to decide this case. Similarly, we reject the foster parents' argument that unexpected rebuttal testimony from an expert for the grandparents warrants a new trial. Sur-

prise is not grounds for a new trial unless "there is a strong probability that a new trial would result differently." *Sward v. Nash,* 230 Minn. 100, 109, 40 N.W.2d 828, 833 (1950).

We also reject the foster parents' contention that they were denied a fair trial because of bias by the trial court. A judge may not preside in a case if he or she has an interest its determination or if he or she could be excluded as a juror for bias. Minn.R.Civ.P. 63.02. "A judge may write, lecture, teach, and speak on nonlegal subjects, * * * if such avocational activities do not detract from the dignity of the office or interfere with the performance of judicial duties." Canon 5, Code of Judicial Conduct. "The decision whether to grant a new trial [for judicial bias] * * * rests within the sound discretion of the trial court and will be reversed only for a clear abuse of that discretion." *Uselman v. Uselman,* 464 N.W.2d 130, 139 (Minn. 1990). We have closely reviewed the record and can find no evidence of bias in the trial court's handling of the case.

Finally, effective ten days after the date this opinion is filed, we lift the temporary restraining order that has prevented D.L. from being removed from her foster parents' home. This will allow the child to be moved to her grandparents' home so that all the parties can put this litigation behind them and get on with their lives. That certainly will be in D.L.'s best interests.

Affirmed.