In re the **ADOPTION OF C.H.**

and

In re the **ADOPTION OF A.H.**

No. C0–96–62.

Court of Appeals of Minnesota.

May 28, 1996.

Review Granted Aug. 6, 1996.

Kenneth J. Jacobs, Forest Lake, for Appellants Holmeses/Hunters.

James T. Reuter, Chisago County Attorney, Alfred S. Alliegro, Assistant County Attorney, for Respondent County.

Wright S. Walling, Gary A. Debele, Walling & Berg, P.A, Minneapolis, for Respondents Cummingses.

Timothy J. Peterson, Lindstrom, for guardian ad litem.

Considered and decided by HUSPENI, P.J., and CRIPPEN and KLAPHAKE, JJ.

## OPINION

KLAPHAKE, Judge.

This case involves petitions from three different couples seeking to adopt C.H. and his sister, A.H. Two couples are relatives of the children: appellants Samuel Holmes, Sr. and Lorraine Holmes are the paternal grandparents and Thomas and Alesia (a.k.a. Lisa) Hunter are the paternal uncle and aunt. Respondents Mike and Marie Cummings are nonrelatives with whom the children reside. The Holmeses/Hunters challenge the trial court's decision denying their adoption petitions and granting the Cummingses' adoption petitions. The Holmeses/Hunters are represented by the same attorney and support each other's petitions. Respondent Chisago County [1] has submitted a brief in support of the trial court's decision.

We conclude that the "open adoption" ordered by the trial court is neither legally recognized nor realistically feasible, that the trial court erroneously applied the family or relative preference of Minn.Stat. § 259.57, subd. 2 (1994), and that nothing in the record defeats the preference in this case. Accordingly, we reverse the trial court's decision and remand the matter with directions to grant either the Holmeses or Hunters' petitions.

## FACTS

In 1991, appellant Lisa Hunter contacted Lori Karp, a Chisago County social worker, when it became clear that C.H. and A.H.'s biological parents were unable to care for them.

In the winter of 1992, the children went to live with the Hunters. After about six months, A.H. moved in with the Holmeses because the Holmeses/Hunters believed that A.H. needed more "one-on-one" care. C.H. continued to reside with the Hunters.

On May 10, 1993, the children's biological parents voluntarily terminated their parental rights. The Holmeses/Hunters supported Chisago County's efforts, and were instrumental in obtaining the biological parents' consent to the termination. The Commissioner of Human Services (Commissioner) was appointed guardian and legal custodian of the children. The biological parents, who

1. Social service agencies from four counties have been involved in this case: Chisago, where the children's biological parents apparently lived and where this proceeding takes place; Washington, where the Holmeses live; Anoka, where the Hunters live; and McLeod, where the Cummingses and the children reside.

now reside in Wisconsin, have not contacted the children or otherwise participated in these adoption proceedings.

The Holmeses/Hunters did not immediately initiate adoption proceedings. They considered adopting the children, but changed their minds for several reasons, including financial concerns and their desire that the children have their own "mom and dad." They claim that they agreed to place the children for adoption after Karp assured them they could maintain contact with the children through an "open adoption." They further claim that Karp never explained options, such as permanent placement, to them; never advised them that an open adoption agreement might not be legally enforceable; and never told them the children were eligible for an adoption subsidy.[2] They also claim Karp promised them if problems arose with contact, they would regain custody of the children. They insist that had they been given accurate information, they never would have agreed to place the children with nonrelatives and would have adopted the children themselves.

With Karp's assistance, the Holmeses/Hunters chose the Cummingses from the state adoption exchange list. The Cummingses had indicated that they were amenable to an open adoption situation. The Holmeses/Hunters testified that they chose the Cummingses because the Cummingses are Roman Catholic and live in a small rural town, and because Marie Cummings was not employed outside the home.

Chisago County placed the children in the Cummingses' home in August 1993. At that time, the children were five and four years old. The Cummingses gave the Holmeses/Hunters verbal assurances that they could maintain contact with the children. Karp drafted an agreement on contact, which the Cummingses signed.

Five months later, in December 1993, Marie Cummings decided to temporarily terminate or "cut off" the children's contact with the Holmeses/Hunters because C.H. began to exhibit problems after visits or phone calls with them. C.H. became emotionally with-

drawn, cried often, and began to wet his bed. Marie Cummings began to take the children to therapist-psychologist Karen Lohn.

Communication between the Cummingses and the Holmeses/Hunters quickly deteriorated. Lohn and several social workers attempted to work with the parties. In April 1994, the Holmeses/Hunters were allowed phone contact with the children, and later during the summer they were allowed two visits. Since then, the Holmeses/Hunters have visited the children three or four times per year. Marie Cummings admits that visits would not have occurred without the social workers, Lohn, or the court.

In May 1994, the Hunters filed petitions with the district court to adopt the children. The Cummingses filed their petitions in June 1994, and the Holmeses filed a petition to adopt the children in November 1994. In December 1994, the Commissioner consented to the Cummingses' petitions. The Commissioner did not consider the Holmeses/Hunters' petitions on their merits, but rejected those petitions on the ground that consent could be given for only one petition. During trial, the court ruled that the Commissioner's withholding of consent was unreasonable and that all three couples' petitions would be considered in a joint trial.

At the September 1995 trial, social worker Karp testified that when the children's biological parents' rights were terminated, the children had special needs and were receiving special educational services. She further testified that the children flourished and thrived under the care of the Holmeses/Hunters, and that the only reason the children were placed with the Cummingses was that, at that time, no relatives wanted to adopt them. Karp agreed that the Holmeses/Hunters had prepared the children well for their placement with the Cummingses.

A number of witnesses testified that the children no longer need special educational services, that they are doing well, and that they have adjusted to their new home, school, and community. The evidence was uncontested that the children are attached to the Cummingses and relate to them as their

---

2. The amount of this subsidy has not been disclosed.

parents. The evidence was also uncontested that the children continue to maintain a primary attachment to the Holmeses/Hunters, particularly Lisa Hunter. Finally, while the children have had adjustment problems, several witnesses suggested that those problems were exacerbated by the limited contact the children had with the Holmeses/Hunters and by the Cummingses' negative comments and reactions to that contact.[3] Several witnesses expressed doubts about whether ongoing contact with the relatives was possible due to the bitterness, acrimony, and lack of trust between the parties.

The social workers involved in this case, Karp and McLeod County social worker Jennifer Johnson, both testified that it would be difficult or traumatic for these children to be removed from the Cummingses but that the children would benefit from ongoing contact with the Holmeses/Hunters. Therapist Lohn testified that separation from the Cummingses would have an "extremely negative" or "devastating" impact on the children, whom she described as susceptible and vulnerable to another loss.

The Holmeses testified they have been married for 43 years and have six adult children and 13 grandchildren.[4] Samuel Holmes is 60, and Lorraine Holmes is 64 years old. Samuel Holmes is retired, and both he and Lorraine Holmes are at home and available to care for the children. Samuel Holmes testified that he did not believe removing the children from the Cummingses and "[b]ringing them back inside our home" would be harmful to them or "insurmountable."

The Hunters have been married for 12 years and have three children.[5] Tom Hunter acknowledged that he has spanked his children, sometimes with a belt; he claimed, however, that he no longer physically punishes his children. Tom Hunter further acknowledged that he is an alcoholic who has been sober since April 1993. He testified that he has been arrested twice for driving while under the influence of alcohol, once in April 1991 and again in April 1993. In connection with the 1993 incident, Lisa Hunter filed a domestic abuse petition against him. She testified that he had been drinking and was attempting to leave the house, that she stood in front of him to stop him, and that he pushed her down the hallway as he was leaving. She claimed that she filed the petition in order to convince him he needed treatment. Lisa Hunter appeared in court, and the petition was dismissed. The Hunters testified that Tom Hunter underwent treatment and has been sober since.

James H. Gilbertson, a licensed psychologist and family therapist, testified on behalf of the Holmeses/Hunters. Gilbertson saw no problem with either the Hunters or Holmeses as potential parents for the children. He emphasized that Tom Hunter is presently doing well in recovery and his wife is very involved and vigilant in that effort. Gilbertson further indicated that he was not concerned about Tom Hunter's past use of corporal punishment, and that after talking with the Hunters he did not believe either was abusive by nature.

Gilbertson acknowledged that if the children were removed from the Cummingses' home, there would be some emotional reactions, including sadness and some sense of loss. Gilbertson did not believe, however, that such a separation would be overly traumatic. Gilbertson explained the children's earliest attachments were to the Holmeses/Hunters, and that C.H. was still exhibiting protracted grief and had not left that principal attachment, particularly with respect to Lisa Hunter.

---

3. There were several references during trial to Marie Cummings seeking treatment for depression in 1988 or 1989 and to her crying uncontrollably at various times since this litigation began in 1994. There were also several references to the Cummingses wanting the adoption finalized "with no strings attached."

4. Apparently, Chisago County had difficulty getting Washington County to do a home study on the Holmeses. The court therefore waived the home study requirement.

5. A home study prepared by Anoka County candidly discussed the Hunters' lives and home. The study portrayed the Hunters as active and loving parents, and concluded there was no reason they should not be given the opportunity to parent C.H. and A.H.

Ray Henderson, the guardian ad litem, submitted a report to the court and testified at trial. Henderson described his recommendation of adoption by the Cummingses as a "package deal": it assumed ongoing visitation by the Holmeses/Hunters and assumed "extensive" counseling for the Cummingses. He concluded that "if there can be no court involvement with visitation, and no commitment to counseling, then [he] would not favor adoption" by the Cummingses. Henderson acknowledged that visitation has been a problem and that communication between the parties has not been good. As late as August 1995, he had concerns with Marie Cummings' ability to freely allow and facilitate visitation.

Henderson testified that if the Cummingses' petitions were not granted, he believed that the Hunters would be the best adoptive parents. Henderson saw no abuse in any of the homes and had no concerns regarding discipline with any of the parties. Henderson's only concerns with the Holmeses' ability to parent the children were the Holmeses' ages; his only concern with the Hunters was Tom Hunter's history of alcoholism. Henderson disagreed with Lohn's conclusion that separation from the Cummingses would be devastating for the children, and generally agreed with Gilbertson that removal from Cummingses' home would probably not be overly traumatic.

After the seven-day trial, the court granted the Cummingses' petitions subject to an "open adoption" arrangement in which the Holmeses/Hunters were given specific visitation rights. The court retained continuing jurisdiction over the visitation issue. The Holmeses/Hunters appealed.

## ISSUES

I. Did the trial court abuse its discretion in ordering an "open adoption" that granted the Holmeses/Hunters visitation?

II. Did the trial court err in its application of the "relative preference" statute?

III. Are the trial court's findings supported by the evidence and sufficient to support its grant of the Cummingses' adoption petitions?

## ANALYSIS

### I

The trial court concluded that it was in the children's best interests to maintain contact with the Holmeses/Hunters, and ordered what it termed an "open adoption." [6] The court granted the Holmeses/Hunters visitation and set out the procedure the parties are to use in scheduling visitation. The Holmeses/Hunters argue that because any visitation rights the court granted them are legally unenforceable and because the evidence shows it is unlikely that the Cummingses will allow visitation to occur, the trial court's decision that this arrangement is in the children's best interest is fatally flawed. We agree.

■ Minnesota law does not recognize "open adoptions," and it is questionable whether the visitation rights granted the Holmeses/Hunters are legally enforceable. When a child is adopted, the biological relatives generally have no legal rights to visitation. Minn.Stat. § 259.59, subd. 1 (1994) (biological parents "shall not exercise or have any rights over the adopted child"); *see Olson v. Olson*, 534 N.W.2d 547, 549 (Minn. 1995); *In re Adoption of A.M.R.*, 527 N.W.2d 565, 566 (Minn.App.1995), *review denied* (Minn. Apr. 18, 1995). While grandparent visitation rights are provided by statute under certain circumstances, those visitation rights are "automatically terminated" when a child is adopted by nonrelatives or third parties. Minn.Stat. § 257.022, subd. 3 (1994).

■ Perhaps more critical, however, is the fact that the trial court ordered this open adoption in the face of clear evidence that the parties are unable to resolve their disputes over visits and contact. Despite the Cummingses' assurances at trial that they are willing to allow contact between the children

---

**6.** The term "open adoption" may have many different meanings, ranging from disclosing the identity of birth parents or relatives, to allowing birth parents or relatives the opportunity to re- ceive photographs and updates of the children annually through the county or adoption agency, to maintaining ongoing contact through visits, letters, and telephone calls.

and their relatives, their actions contradict these assurances. A few weeks before trial, the guardian ad litem observed behavior by Marie Cummings that led him to conclude she would not facilitate visitation. And even on appeal, the Cummingses insist that contact should be allowed at their discretion and challenge the trial court's authority and decision to impose a specific visitation schedule.[7] Given the likelihood that visitation and contact will not occur without animosity and court intervention, the trial court abused its discretion in ordering this open adoption.

## II

The trial court concluded that it was in the children's best interests to grant the Cummingses' adoption petitions. In so doing, it failed to correctly apply the following statutory preference for placement of children with family members:

> In reviewing adoptive placement, the court shall consider preference, and in determining appropriate adoption, the court shall give preference, in the absence of good cause to the contrary, to (a) a relative or relatives of the child, or, if that would be detrimental to the child or a relative is not available, to (b) a family with the same racial or ethnic heritage as the child, or if that is not feasible, to (c) a family of different racial or ethnic heritage from the child that is knowledgeable and appreciative of the child's racial or ethnic heritage.

Minn.Stat. § 259.57, subd. 2 (1994).

The preference for family placement is well established in Minnesota law. *See In re Welfare of·D.L.,* 486 N.W.2d 375, 377, 380 (Minn.1992), *cert. denied,* 506 U.S. 1000, 113 S.Ct. 603, 121 L.Ed.2d 539 (1992); *In re Welfare of M.M.,* 452 N.W.2d 236, 238–39 (Minn.1990) (under various statutory schemes, legislature has endorsed societal goal of strengthening and preserving biological familial structure). The preference mandates that adoptive placement with relatives is presumptively in a child's best interest absent a showing of detriment to the child or other good cause to the contrary. *D.L.,* 486 N.W.2d at 380.

Despite this mandate, the trial court's analysis gave virtually no preference or priority to the family members in this case. The trial court characterized its analysis of the relative preference as a "bursting bubble" approach combined with "some evidence": once all the petitioners met the minimum requirements for adoption, the preference applied until some evidence was presented by the competing, nonrelative petitioners. The court then adopted, by analogy, the best interests factors of Minn.Stat. § 518.17 and treated the relative preference as only one factor to balance and consider with the other statutory factors. While these best interest factors are often relevant in an adoption proceeding, they are not controlling. *See D.L.,* 486 N.W.2d at 379 n. 4. Therefore, we conclude that the trial court erred in its application of the relative preference statute.

## III

The trial court's findings may nevertheless support its decision to place the children with the Cummingses if those findings establish either the detriment or good cause necessary to defeat the relative preference. A trial court is given some discretion in determining what constitutes detriment or good cause, and its findings on the issue will not be reversed unless clearly erroneous. *See In re Custody of S.E.G.,* 521 N.W.2d 357, 363 (Minn.1994) (involving good cause under Indian Child Welfare Act), *cert. denied,* —— U.S. ——, 115 S.Ct. 935, 130 L.Ed.2d 881 (1995).

Detriment has been construed to encompass either a demonstrated actual injurious impact of the relationship on the physical or emotional well-being of the child or a showing to a reasonable degree of certainty that the facts and circumstances of the proposed placement pose the substantial likelihood that actual harm will occur.

*M.M.,* 452 N.W.2d at 239. Thus, actual harm or the substantial likelihood of actual harm

---

7. We note that the Cummingses did not file a notice of review, which would have been the proper way to challenge the trial court's decisions here. *See* Minn.R.Civ.App.P. 106.

must be demonstrated. While good cause necessary to defeat the relative preference has not been clearly defined, "good cause" is generally defined as "[s]ubstantial reason, one that affords a legal excuse." Black's Law Dictionary 623 (5th ed. 1979). "Good cause" is considered "in light of the facts." *Weiler v. Lutz*, 501 N.W.2d 667, 671 (Minn. App.1993), *aff'd sub nom.*, *Valentine v. Lutz*, 512 N.W.2d 868 (Minn.1994).

▮ Good cause or detriment might be demonstrated by domestic abuse, alcoholism, or physical punishment if actual harm to the child's physical or emotional health is demonstrated. The trial court made findings indicating that Tom Hunter is unstable or unsuitable because he has exhibited these problems in the past. The uncontradicted evidence, however, shows that Tom Hunter successfully completed treatment for alcohol abuse three years ago. Since that time, he has remained sober and has neither abused his wife nor physically punished his children. The Hunters, the social worker who prepared the Hunters' home study, Gilbertson, and the guardian ad litem, all indicated that they believed Tom Hunter was a suitable adoptive parent and did not believe he would harm or place the children at risk.

▮ Good cause or detriment might be demonstrated by an inability to care for two siblings in the same home or by an inability to care for a child with special physical or emotional needs. While the Holmeses/Hunters initially found it necessary to separate the children so that they could receive more "one-on-one" time, Gilbertson testified he believed this was appropriate and beneficial to the children. By the time the children were placed with the Cummingses, they were well prepared and ready to receive new parents. In addition, the children no longer receive or need special educational services. While the children exhibit continuing adjustment problems, those problems may be related to their limited contact with the Holmeses/Hunters and the Cummingses' negative comments about that contact.

▮ Good cause or detriment might be demonstrated by the advanced age of a proposed adoptive parent. *D.L.*, 486 N.W.2d at 381 (recognizing that good cause might be demonstrated by grandmother's advanced age, widowhood, and difficulty in parenting her own children). Nothing in the present record would support a finding that the Holmeses' ages or health prevent them from adequately parenting the children.

▮ In an extreme case, good cause might be demonstrated by the adverse impact of separating children from foster parents. *Cf. D.L.*, 486 N.W.2d at 381 (good cause necessary to defeat relative preference not shown merely because child would be adversely affected by separation from his or her foster parents or custodians). While the children here will surely be affected by removal from the Cummingses' home, they still have a primary attachment to the Holmeses/Hunters. Gilbertson, the guardian ad litem, and Samuel Holmes all testified that separation from the Cummingses would be difficult but not insurmountable.

▮ Finally, good cause might be demonstrated when the relatives change their minds after initially agreeing to place children with nonrelatives. In an appropriate case, the facts might demonstrate that the relatives "waived" the family preference. *See* Minn.Stat. § 259.57, subd. 2 (request by child's genetic parents that family preference not be followed will be honored if consistent with child's best interests). In this case, however, the facts are undisputed that the Holmeses/Hunters were misled as to their right to maintain contact with the children. It is also undisputed that they were never informed that an adoption subsidy was available. The Hunters, in particular, testified that they did not think they had the financial resources to care for the children. Had they been fully and adequately informed, the Holmeses/Hunters claim that they would not have agreed to placement of the children with the Cummingses. This cannot be interpreted as a waiver on their part. *See Anda Constr. Co. v. First Fed. Sav. & Loan Ass'n*, 349 N.W.2d 275, 278 (Minn.App.1984) (waiver is equitable principle involving voluntary relinquishment or abandonment of known rights), *review denied* (Minn. Sept. 5, 1984).

We therefore conclude that the trial court's findings and decision fail to support the exis-

tence of any detriment to the children or other good cause that would defeat the relative preference in this case. In addition, our review of the present record leads us to conclude that no detriment or good cause exists in this case.

## DECISION

We reverse the grant of the Cummingses' adoption petitions and remand the matter to the trial court with directions to grant either the Holmeses or the Hunters' petitions. This decision should be made on an expedited basis. Given the extensive proceedings and evidence already gathered, we see no need for the taking of additional evidence, with the possible exception, in the trial court's discretion, of a home study of the Holmeses.

**Reversed and remanded.**