**In the Matter of the Petition of S.G. and L.G. to Adopt P.U.K. and D.F.K.**

**In the Matter of the Petition of D.D. and L.D. to Adopt P.U.K. and D.F.K.**

No. A12–0066.

Supreme Court of Minnesota.

March 27, 2013.

Paul H. Anderson, J., filed a concurring opinion.

Wright, J., filed an opinion concurring in part and dissenting in part.

Page, J., filed a dissenting opinion in which Stras, J., joined.

Michael L. Perlman, Katherine M. Ray, Perlman Law Office, Minnetonka, MN, for appellants D.D. and L.D.

Wright S. Walling, Stacia W. Driver, Walling, Berg & Debele, P.A., Minneapolis, MN, for respondents S.G. and L.G.

Michael O. Freeman, Hennepin County Attorney, Nancy Jones, Assistant County Attorney, Minneapolis, MN, for Hennepin County Human Services and Public Health Department.

Jennifer Eichten, Minneapolis, MN, for the Guardian ad Litem.

## OPINION

GILDEA, Chief Justice.

This contested adoption case arises out of two petitions to adopt P.U.K. and D.F.K.: one filed by S.G. and L.G., P.U.K and D.F.K.'s foster parents; and one filed by D.D. and L.D., P.U.K. and D.F.K.'s

grandmother and step-grandfather. The district court considered both petitions and found that it was in the best interests of P.U.K. and D.F.K. to be adopted by S.G. and L.G. ("foster parents") and accordingly granted their petition. The court then denied the adoption petition of D.D. and L.D. ("grandparents"). The grandparents appealed to the Minnesota Court of Appeals, which upheld the district court's decision, concluding that "the ultimate determination of a child's placement depends upon examination of the child's best interests" and "the district court did not abuse its discretion in granting [the] foster parents' adoption petition." *In re Petition of S.G. & L.G. to Adopt P.U.K. & D.F.K.*, No. A12–0066, 2012 WL 3262976, at *1, *6 (Minn.App. Aug. 6, 2012).

In this appeal, the grandparents argue that the district court erred in not according them preference and ignoring the plain language of Minn.Stat. § 259.57, subd. 2(c) (2012) by considering the grandparents' and foster parents' petitions side-by-side. The grandparents also argue that the district court abused its discretion by misapplying some of the factors enumerated in Minn.Stat. § 260C.212, subd. 2(b) (2012). Because the district court properly applied Minn.Stat. § 259.57, subd. 2(c) and did not abuse its discretion, we affirm.

This action involves two young children, P.U.K. and her sister, D.F.K. P.U.K. was born on October 9, 2009 in Minneapolis. Her biological mother is J.S. and her biological father is P.K. At P.U.K.'s birth, both she and J.S. tested positive for cocaine. P.U.K. was born full-term but significantly underweight, had tremors in her hands and legs, and very dry skin—all symptoms consistent with prenatal cocaine exposure. She was very tense, needed to be swaddled all the time, and her eyes did not focus well. P.U.K. has reached developmental milestones, such as smiling and laughing, late in the normal range. L.G. described P.U.K. as a "feisty," high-spirited child who makes good eye contact; but P.U.K. also is emotionally volatile and extremely sensitive to all types of stimuli, has trouble self-soothing and problem solving, does not handle change or separation well, and has trouble sleeping at night.

D.F.K. was born on September 22, 2010. Her biological parents also are J.S. and P.K. At D.F.K.'s birth, both she and J.S. tested positive for cocaine. D.F.K. was born full-term and underweight. She smiles often, makes good eye contact, and usually sleeps through the night. L.G. stated that D.F.K. is very attached to L.G. and has anxiety about strangers. D.F.K.'s development is delayed by about 3 months, but she does not qualify for the school district's special services.

Both P.U.K. and D.F.K. were placed in the foster parents' home for foster care within days of their births and have continuously resided with the foster parents.[1] Immediately after each child was placed in foster care, the Hennepin County Human Services and Public Health Department ("the County") filed a petition to involuntarily terminate parental rights to each child. The County was aware of J.S.'s lengthy history of chemical dependency and her abandonment of two previous children. Additionally, the County was aware

---

1. The foster parents are a married couple residing in Plymouth. S.G. is a certified public accountant and L.G. works part-time at her church but is otherwise a homemaker. The foster parents obtained their foster care license in August 2008 and currently have nine children living in their home, including their four biological children, two adopted children, a friend of their daughter, and P.U.K. and D.F.K. The district court found that the foster parents have met the needs of P.U.K. and D.F.K. and "have been caring, patient, and loving parents."

that P.U.K and D.F.K.'s father, P.K., was an active drug user and had a history of domestic violence.

The district court involuntarily terminated the parental rights of J.S. and P.K. to P.U.K. by default in early June 2010. Approximately 5 months later, in November 2010, the court involuntarily terminated the parental rights of J.S. and P.K. to D.F.K. by default. As a result of the terminations of parental rights, P.U.K. and D.F.K. are in the legal custody of the Minnesota Commissioner of Human Services ("the Commissioner") and are state wards for adoption. Minn.Stat. § 260C.325, subd. 1 (2012).

D.D. first contacted the County and expressed interest in adopting P.U.K. in December 2009.[2] For reasons that are not clear, however, the County did not identify her as a permanency resource for P.U.K. until March 4, 2010. To investigate and determine whether the grandparents were an appropriate adoptive placement, the County sent, in April 2010, an Interstate Compact on the Placement of Children ("ICPC") request to the State of Mississippi, asking Mississippi to conduct a home study.[3] Mississippi did not respond to the ICPC request for several months, in part because L.D. refused to attend required training classes or provide fingerprints. D.D. informed the County that L.D. was "old school" and was not going to get fingerprinted or attend classes. On November 30, 2010, the County withdrew its ICPC request due to lack of progress.

In December 2010, the County asked the foster parents if they were willing to adopt P.U.K. and D.F.K. The foster parents consented to the adoption, and the County reported to the district court that it supported the foster parents as an adoptive placement for the children and was working with the foster parents toward the adoption. On March 17, 2011, the foster parents filed a petition to adopt P.U.K. and D.F.K.

After the County asked the foster parents to consider adopting the children, but

---

**2.** The grandparents are a married couple residing in Gautier, Mississippi. D.D. is the paternal grandmother of P.U.K. and D.F.K. and L.D. is the girls' step-grandfather. D.D. is employed part-time cleaning homes, and L.D. is retired. They also own and manage rental properties. The grandparents were licensed as "resource parents" in January 2011, but they do not have any children currently living in their home. *See* North American Council on Adoptable Children, *A Handbook for Training Concurrent Permanency Planning Resource Parents in Minnesota* 1–2, available at http://www.nrcpfc.org/cpt/docs/concurrenthandbookfosterparents.pdf. (last visited March 14, 2013) (defining "resource parents" as individuals who "agree to serve as the young child's temporary foster family, and at the same time commit to adopt or assume legal custody of the child should birth family reunification efforts fail"). The district court found "that the [grandparents] love the children and would adequately provide for their physical needs."

**3.** *See* Minn.Stat. § 260.851 (2012). The ICPC is an agreement among the "fifty states that coordinates the movement of children across state lines for the purpose of placement in . . . adoptive homes." Secretariat to the Association of Administrators of the Interstate Compact on the Placement of Children, *Guide to the Interstate Compact on the Placement of Children,* (1992) available at http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&Revision SelectionMethod=Latest Released&dDoc Name=id_001471 (last visited March 14, 2013). The ICPC requires that "[p]rior to sending, bringing or causing any child to be sent or brought into a receiving state for placement in foster care or as a preliminary to a possible adoption, the sending agency shall furnish the appropriate public authorities in the receiving state written notice." Minn.Stat. § 260.851, art. 3(b). The receiving state then has the responsibility to determine whether the transfer and placement would be "contrary to the interests of the child." *Id.,* art. 3(d).

before the foster parents filed their petition, the County finally received an approved home study from Mississippi regarding the grandparents. At that point, the County resumed consideration of the grandparents as an adoptive placement for P.U.K. and D.F.K. And, on April 12, 2011, D.D. filed a petition to adopt P.U.K. and D.F.K. The petition was later amended to add L.D. as an adoptive parent. The County thereafter notified the district court that it had decided to withdraw its support of the foster parents' petition and that the County instead supported the grandparents' petition.[4]

The district court consolidated the petitions of the foster parents and grandparents and scheduled phase one of a contested adoption trial for the end of June 2011. *See* Minn. R. Adoption P. 44. The Commissioner was unwilling to consent to the adoption of P.U.K. and D.F.K. by either the foster parents or the grandparents.[5] *See In re Petition to Adopt S.T. & N.T.*, 512 N.W.2d 894, 897 (Minn.1994) (holding that the district court has "jurisdiction over the adoption proceeding absent the Commissioner's consent"). As a result, the parties stipulated that the court: (1) find it unreasonable that DHS had not consented to the adoption of the children by either party, (2) waive phase one of the trial, and (3) proceed immediately to phase two.

Phase two of the contested adoption trial was held in Hennepin County District Court in August and September 2011. Following phase two of the trial, the district court evaluated the "best-interests" factors in Minn.Stat. § 260C.212, subd. 2(b), first with respect to the grandparents and then with respect to the foster parents. The court considered the testimony of the girls' guardian ad litem, an expert witness, and the girls' pediatrician. The court concluded that, by a preponderance of the evidence, it was in the best interests of P.U.K. and D.F.K. to be adopted by the foster parents. The court expressed concerns about the grandparents' ability to acknowledge and properly address the girls' special needs, and noted the potential emotional and developmental damage that could result from removing the girls from the only home they know. Additionally, the court noted the secure, happy, and healthy relationship the girls have with the foster parents, and expressed hope the foster parents would allow the girls to form a relationship with the grandparents. The court therefore granted the foster parents' petition to adopt P.U.K. and D.F.K. and denied the grandparents' petition.

4. Before the adoption could proceed, however, the County was required to obtain authorization from the Minnesota Department of Human Services ("DHS") Sibling Separation Review Team ("SSRT") to separate the girls from their older brother. Two of the three people on the SSRT recommended that P.U.K. and D.F.K. not be removed from the foster parents' home. One member wrote "[P.U.K.] and [D.F.K.] have been in their placements almost since birth. Although this is not the best practice, it would not be in the children's best interest to be moved now." The DHS formally approved the County's request for sibling separation on February 9, 2011.

5. When a child is in the legal custody of the Commissioner, the child cannot be adopted absent the Commissioner's written consent. Minn. R. Adoption P. 33.01(g). If the Commissioner does not consent, the adoption trial is then held in two phases. Minn. R. Adoption P. 42.03, subd. 2. The first phase is to "determine whether the consent to the adoption by the Commissioner ... was unreasonably withheld from the petitioner" and the second phase to "determine whether adoption is in the best interests of the child, and, if so, adoption by whom." *Id.*

The grandparents appealed to the court of appeals. *In re Petition of S.G. & L.G. to Adopt P.U.K. & D.F.K.,* 2012 WL 3262976, at \*2. The court of appeals affirmed, concluding that the district court did not err in its application of Minn.Stat. § 259.57, subd. 2(c) by considering the grandparents' petition but ultimately deciding that the girls' best interests did not support granting their petition. *Id.* at \*6. Additionally, the court of appeals held that the district court did not abuse its discretion in evaluating the best interests factors. *Id.* at \*9.

We granted the grandparents' petition for review. On appeal to our court, the grandparents argue that the district court erred in its application of Minn.Stat. § 259.57, subd. 2(c). The grandparents also argue that the district court erred in concluding that the foster parents' adoption of the children would be in the best interests of the children. We consider each argument in turn.

## I.

■ We turn first to the issue of whether the district court erred in its application of Minn.Stat. § 259.57, subd. 2(c), which requires the court to "consider placement, consistent with the child's best interests and in the following order, with (1) a relative or relatives of the child, or (2) an important friend with whom the child has resided or had significant contact." We review the district court's legal interpretation of the adoption statute de novo. *In re the Adoption of C.H.,* 554 N.W.2d 737, 742 (Minn.1996).

The grandparents contend that the district court did not follow the proper procedure and ignored the plain language of Minn.Stat. § 259.57, subd. 2(c) by considering the grandparents' and foster parents' petitions side-by-side, rather than considering the grandparents' petition in its entirety before addressing the other petition. What the court should have done, according to the grandparents, was consider their petition first and, "if it determined that placement with [the grandparents] was consistent with the children's best interests, *stopped there.*" The court should only have moved on to consider the foster parents' petition, the grandparents argue, "if it found that placement with [the grandparents] was not consistent with the children's best interests." Additionally, the grandparents contend that without special weight being given to the relative preference in Minn.Stat. § 259.57, subd. 2(c), foster parents will have an enormous advantage over relatives in situations where children are already living with the foster parents.

The foster parents argue that the best interests of the children is the primary issue in all adoptions and we should not lose sight of that when interpreting Minn. Stat. § 259.57, subd. 2(c). The foster parents further argue that the district court is required to make an individualized determination of the children's needs based on the statutory placement factors in Minn. Stat. § 260C.212, subd. 2(b), rather than applying a broad policy favoring the placement of children with relatives. Additionally, the foster parents argue that because Minn. R. Adoption P. 44.04 requires the petitioner to prove by a preponderance of evidence that the adoption is in the best interests of the child, the district court should not be required to find that it is not in the best interests of the child to be adopted by one party after the court has decided it is in the best interests of the child to be adopted by the other party.

■ We recognize that "[a]doption is a creation of statute and therefore the court's authority in matters relating to adoption is limited to the authority set forth by statute." *In re the Adoption of*

*C.H.*, 554 N.W.2d at 740; *see also In re McKenzie*, 197 Minn. 234, 236, 266 N.W. 746, 747 (1936) ("Adoption is a creature of statute. It was unknown to the common law.").[6] The language of the statute at issue here—Minn. Stat. § 259.57, subd. 2(c)—requires the district court to "consider placement, consistent with the child's best interests and in the following order, with (1) a relative or relatives of the child or (2) an important friend with whom the child has resided or had significant contact." Notably, unlike in previous versions of Minn.Stat. § 259.57, subd. 2, the word "preference" does not appear in the current version. *Compare, e.g.,* Minn.Stat. § 259.57, subd. 2(c) (2012) ("In reviewing adoptive placement and in determining appropriate adoption, the court shall consider placement, consistent with the child's best interests and in the following order, with (1) a relative or relatives of the child...."), *with* Minn.Stat. § 259.57, subd. 2 (1994) ("[I]n determining appropriate adoption, the court shall give preference, in the absence of good cause to the contrary, to (a) a relative or relatives of the child...."). The current version of the statute requires the district court to "consider" placement with "a relative or relatives of the child" before considering placement with "an important friend with whom the child has resided or had significant contact." Minn.Stat. § 259.57, subd. 2(c) (2012).

The American Heritage Dictionary defines "consider" as "[t]o think carefully about," "[t]o form an opinion about; judge" or "[t]o take into account; bear in mind." *The American Heritage Dictionary of the English Language* 402 (3d ed.1996). By contrast, the word "preference" is defined as "[t]he selecting of someone or something over another or others." *Id.* at 1428. Therefore, under the current statute, the district court was required to think carefully and form an opinion about the grandparents' petition before considering the petition of the foster parents. But the language directing the order of consideration does not require that the district court prefer a relative over a nonrelative in determining the best interests of the child, nor does it establish a preference for relatives in the same way that earlier versions of the statute did. *See, e.g.,* Minn.Stat. § 259.57, subd. 2 (1994) ("[I]n determining appropriate adoption, the court shall give preference, in the absence of good cause to the contrary, to (a) a relative or relatives of the child....").

The district court's analysis comports with the plain language of the statute. In its order, the court analyzed each of the best interests factors in Minn.Stat. § 260C.212, subd. 2(b), first with respect to the grandparents and then with respect to the foster parents. The court also considered the recommendation of the guardian ad litem and expert testimony at trial. Then, the court concluded that "[a]lthough the Court is convinced that [the grandparents] love the children and would adequately provide for their physical needs, the Court has real concerns about [the grandparents'] ability to recognize the children's need for services and seek out additional services if necessary." In reaching this conclusion, the court noted that "[D.D.] was unable to identify any of the

---

6. We recognize that our previous case law discussed a common law preference for relatives. *In re Welfare of M.M.*, 452 N.W.2d 236, 238 (Minn.1990) (noting that in the absence of a child's natural parents, relatives often step forward to assume a parental role such that "a body of common law developed according a custodial preference to near relatives"). At oral argument, however, both parties agreed that this case presents only an issue of statutory interpretation.

girls' special needs except for [P.U.K.]'s difficulty sleeping." The court also relied on the testimony of the expert witness and the pediatrician, both of whom recommended that the girls remain with the foster parents. Finally, the court concluded that it did "not believe it is in P.U.K.'s and D.F.K.'s best interests to be removed from [the foster parents'] home."

It is true that the district court did not analyze the grandparents' petition in its entirety before turning to analyze the foster parents' petition. The court also did not expressly conclude in its order that it was not in the girls' best interests to be adopted by their grandparents, which would be the better practice. But the court did consider and then form a conclusion about the grandparents' petition with respect to each factor before considering the foster parents' petition on that factor. Additionally, when the court ultimately concluded that it was not in the best interests of P.U.K. and D.F.K. to be removed from the foster parents' home, it impliedly concluded, as the court of appeals noted, that it was not in the best interests of P.U.K. and D.F.K. to be adopted by the grandparents. Only then did the court grant the petition of the foster parents to adopt P.U.K. and D.F.K.

The current version of Minn.Stat. § 259.57, subd. 2(c), requires that the district court first consider adoption by relatives before considering adoption by nonrelatives. The consideration requirement is not meaningless, as the grandparents suggest. This is so because if both the relative and nonrelative petitioners are equally qualified to adopt and the best interests analysis renders an equivalent result as to each party, the relative would benefit from being considered first and could proceed with the adoption. That is not, however, the situation presented here. Here, the court considered the grandpar-

ents' petition first with respect to each statutory factor and made a determination about the grandparents' petition consistent with the overarching purpose of the adoption statute, safeguarding the best interests of the children. We therefore hold that the district court did not err in its application of Minn.Stat. § 259.57, subd. 2(c).

## II.

■ We turn next to the question of whether the district court abused its discretion in determining that it was in the best interests of P.U.K. and D.F.K. to be adopted by the foster parents. Minnesota law requires the district court to "ensure that the best interests of children are met by" conducting "an individualized determination of the needs of the child." Minn. Stat. § 259.57, subd. 2(a) (2012). To make this determination, the court is directed to consider the following factors:

(1) the child's current functioning and behaviors; (2) the medical needs of the child; (3) the educational needs of the child; (4) the developmental needs of the child; (5) the child's history and past experience; (6) the child's religious and cultural needs; (7) the child's connection with a community, school, and faith community; (8) the child's interests and talents; (9) the child's relationship to current caretakers, parents, siblings, and relatives; and (10) the reasonable preference of the child, if the court, or the child-placing agency in the case of a voluntary placement, deems the child to be of sufficient age to express preferences.

Minn.Stat. § 260C.212, subd. 2(b).

■■ We review the district court's decision whether to grant an adoption petition under the abuse of discretion standard. *In re Jordet,* 248 Minn. 433, 443, 80 N.W.2d 642, 649 (1957). Due to the num-

ber of statutory factors and the overall best interests standard, we have recognized that "[i]n any particular case ... the trial court has a substantial degree of latitude in determining whether" the child's best interests favor adoption by a relative or a nonrelative. *In re the Adoption of C.H.*, 554 N.W.2d at 743; *see also id.* (" '[B]ecause the decision to grant or deny consent to an adoption cannot be made without considering the particular situation of the child, the trial court must be free to examine all relevant evidence....' " (quoting *In re S.T. and N.T.*, 512 N.W.2d at 898)). But, in exercising its discretion, "a trial court must make detailed factual findings showing that the child's best interests are being served." *Id.* (citation omitted) (internal quotation marks omitted); *see also In re Welfare of M.M.*, 452 N.W.2d 236, 239 (Minn.1990) (concluding that "the district court's findings of fact are deficient" because "the trial court merely recited or summarized excerpted portions of testimony of several ... witnesses").

Our review of the district court's reasoning and the evidence in the record shows no abuse of discretion here. The court's order contains detailed findings and analysis demonstrating that the court focused on the best interests of the children, as the statute requires. Minn.Stat. § 259.57, subd. 2(c) (noting that "the court shall consider placement, consistent with the child's best interests"). The court explained the reasons for its conclusion that it was in the best interests of P.U.K. and D.F.K. to be adopted by the foster parents. Specifically, the court had "real concerns" with the grandparents' ability to meet and address the children's existing, and any future, special needs. The court also expressed the belief that "there is a real risk of future emotional and developmental damage if the children are removed" from the foster parents' home. The evidence in the record supports the

court's concerns. *See In re the Adoption of C.H.*, 554 N.W.2d. at 743 (upholding the district court's decision where the court's "detailed findings of fact [were] well substantiated by the evidence and thoroughly support[ed] its conclusion").

The grandparents, however, urge us to conclude that the district court abused its discretion and they challenge the court's findings with respect to the children's medical, educational, and developmental needs, the children's cultural needs, and the willingness of the foster parents to allow the children to have a relationship with their biological family. The grandparents contend the court improperly deemphasized their ability to care for the children's special needs, gave no weight to their ability to best meet the children's cultural needs, and glossed over L.G.'s statement that she would not allow the children to have a relationship with their biological family. The grandparents' arguments do not demonstrate that the district court abused its discretion.

With respect to the medical, educational, and developmental needs of the children, the record confirms that they have special needs, including delayed development and other behaviors suggesting that they have been affected by prenatal exposure to cocaine. The record also contains the testimony of the expert witness and the girls' pediatrician suggesting that children prenatally exposed to cocaine have a more difficult time adjusting and adapting to change. The district court carefully and extensively considered the impact of the children's special needs on possible placement with both the grandparents and the foster parents. The court's findings of fact were specific and detailed with respect to the children's needs, the reluctance of the grandparents to acknowledge those needs, and the foster parents' efforts to address the children's needs. The evi-

dence in the record supports the district court's findings.

With respect to P.U.K.'s and D.F.K.'s cultural needs, the record reflects that the girls are African–American, as are the grandparents, and the district court's findings reflect that D.D. could support the cultural needs of P.U.K. and D.F.K., and that D.D. believes it important for the children to learn about their family and its traditions.[7] The foster parents, as well as their biological children, are Caucasian. The foster parents have adopted two sons who are Asian–American and African–American respectively, and an African–American friend lives with the family. The district court did not specifically explain how the foster parents were able to meet the cultural needs of the children other than to find that the foster parents "believe that diversity is very important." We share the court of appeals' concern that the district court's findings on this factor "grossly simplify" the girls' needs. *In re Petition of S.G. & L.G. to Adopt P.U.K. & D.F.K.*, 2012 WL 3262976, at *7. But given our deferential standard of review, we cannot say that the court's analysis of this factor renders its overall best-interests analysis an abuse of discretion.

Finally, with respect to whether P.U.K. and D.F.K. will continue to have a relationship with their biological family, the record contains conflicting evidence.[8] We do not disturb "findings of fact based on conflicting evidence ... unless manifestly and palpably contrary to the evidence as a whole." *In re the Adoption of C.H.*, 554 N.W.2d at 743 (citation omitted) (internal quotation marks omitted). The district court's finding with regard to the foster parents' commitment to ensuring that the girls maintain a relationship with their biological family cannot be set aside under that standard.

In sum, we have carefully reviewed the record and this review convinces us that the district court did not abuse its discretion in concluding that adoption by the foster parents is in P.U.K.'s and D.F.K.'s best interests.

Affirmed.

Concurring, ANDERSON, PAUL, J.

Concurring in part, dissenting in part, WRIGHT, J.

Dissenting, PAGE, STRAS, JJ.

7. Although the Legislature has eliminated the race or national origin of the adoptive parent as factors in considering an appropriate placement, and "[p]lacement of a child cannot be delayed or denied based on [the] race ... of the adoptive parent or child," Minn. Stat. § 259.57, subd. 2(c), the requirement to consider a child's "cultural needs" in the best-interests analysis, Minn.Stat. § 260C.212, subd. 2(b), demonstrates that those aspects of one's identity that are informed by racial and ethnic heritage, cultural values, and traditions passed across generations are relevant factors in determining the child's best interests.

8. D.D. testified about her family-centered life and the important connection she provides to the children's biological family. L.G. also testified that she wanted P.U.K. and D.F.K. to have a relationship with their biological family, including D.D. But L.G. said she had changed her mind over the course of the proceedings. Based on its consideration of the totality of the evidence and the proceedings, the district court expressed its hope "that this statement was only made due to the highly emotional nature of these proceedings. The Court is confident that [L.G.] understands the value for adopted children of having a relationship with their biological families ... and urges her not to let these proceedings prevent [P.U.K.] and [D.F.K.] from having such a relationship with [D.D.]." Further, the record reflects that the foster parents have facilitated a relationship between their adopted son and his biological family.

ANDERSON, PAUL H., Justice (concurring).

I agree with the majority that the district court did not err in its application of Minn.Stat. § 259.57, subd. 2(c) (2012). I also agree that the district court did not abuse its discretion by determining that it is in the best interests of P.U.K. and D.F.K. to be adopted by the foster parents. However, I write separately to supplement the majority's analysis of the statute and more fully explain why I conclude that the dissent's interpretation is inconsistent with the plain statutory language.

The statute we must interpret in this case is Minn.Stat. § 259.57, subd. 2(c), which provides in relevant part:

> In reviewing adoptive placement and in determining appropriate adoption, the court shall consider placement, *consistent with the child's best interests* and in the following order, with (1) a relative or relatives of the child, or (2) an important friend with whom the child has resided or had significant contact.

(Emphasis added.) The dissent, along with Justice Wright in her concurrence/dissent, contends that the majority ignores the word "placement" by focusing on the word "consider." According to the dissent, section 259.57, subdivision 2(c) requires the district court to consider placement "in the specified order, not that the statutory best interest factors be considered in the specified order" and the majority's interpretation "conflates consideration of placement with consideration of the best interest factors." The dissent concludes that Minn.Stat. § 259.57, subd. 2(c) imposes an order of priority between competing classes of petitioners. Thus, a district court—when faced with competing petitions from both classes—must consider placement first with the relatives. Only if the district court determines that such a placement is inconsistent with a child's best interests may the court consider placement with the second class—an important friend with whom the child has resided or had significant contact—such as the foster parents, S.G. and L.G.

In reaching its conclusion, the dissent claims that the reasoning in the majority's opinion is flawed. While I concede that section 259.57, subdivision 2(c) is not a model of clarity, I reach a different result. In doing so, I conclude that the dissent's interpretation of the statute suffers from the very flaw the dissent attributes to the majority. By linking the word "placement" with the phrase "in the following order," the dissent overlooks the most critical language in Minn.Stat. § 259.57, subd. 2(c), which expressly states that "the court shall consider placement[ ] consistent with the child's best interests." As I read the statute, the phrase "best interests," by definition, requires comparison. *See The American Heritage Dictionary of the English Language* 172 (5th ed.2011) (defining best as "surpassing all others in excellence, achievement, or quality"); *see also Nat'l Hells Canyon Ass'n v. Fed. Power Comm'n,* 237 F.2d 777, 784 (D.C.Cir.1956).[1]

In the context of this statute, the relevant comparison is between the competing petitions for adoption. Accordingly, the district court must "consider placement . . . with (1) a relative or relatives of the

---

1. In English grammar, "best" is the superlative form of the comparative adjectives good, better, and best. *See* Bryan A. Garner, *Garner's Modern American Usage* 171 (3d ed.2009). Strictly speaking, the superlative is only needed when more than two objects are being compared. *Id.* However, use of the superlative with two objects is ubiquitous, e.g., "best of the pair." *Id.* And the use of the superlative in the context of the adoption statute makes sense given that the statute contemplates the court's review of multiple petitions.

child, or (2) an important friend with whom the child has resided and had significant contact." Minn.Stat. § 259.57, subd. 2(c). Under the plain meaning of the statute, the court must exercise its discretion to determine which placement is consistent with the child's best interests by, at a minimum, employing the statutory factors set forth in Minn.Stat. § 260C.212, subd. 2(b) (2012). When doing so, the statute dictates that the court conduct a comparative analysis. In my view, this interpretation of the statute is most credible based on the Legislature's removal of the "preference" for relatives that existed in older versions of the statute and because the statute must be interpreted in light of the background principle enunciated in section 259.57, subdivision 2(a). Section 259.57, subdivision 2(a) states that "[t]he policy of the state of Minnesota is to ensure that the best interests of children are met by requiring an individualized determination of the needs of the child and how the adoptive placement will serve the needs of the child."

In essence, the Legislature has set up a simple scheme that reflects a common instruction often given to children learning to cross the street: "first look left, and then look right." The dissent contends that the district court must "look left." If no traffic is coming—i.e., if placement with the relatives would be consistent with the best interests of the children—then it is time to cross the street. But the statute quite sensibly requires the district court to also "look right" so that the court may make a fully informed, comparative determination as to which placement is *best.* To be sure, the statute requires that the district court "look left" before it "looks right." That is the import of the clause, "in the following order." Minn.Stat. § 259.57, subd. 2(c). And after the district court analyzes both petitions, nothing in the statute prohibits the court from "look-ing left" again. But the statute's plain language mandates that the court *must* at a minimum look both ways. Minn.Stat. § 259.57, subd. 2(c).

For the foregoing reasons, I cannot conclude, as the dissent does, that the statute imposes an order of priority that essentially reinstates the preference for relatives that the Legislature has specifically excised from the statute. I therefore join the majority's opinion in full.

WRIGHT, Justice (concurring in part, dissenting in part).

In this case, we must decide whether the district court abused its discretion when, after considering the best interests of these young children, it granted the foster parents' petition to adopt. After a careful and thorough review of the record, I concur in part and dissent in part.

I conclude, as the dissent of Justice Page does, that the district court erred in its application of Minn.Stat. § 259.57, subd. 2(c) (2012), when it failed to "consider placement" of the children with their paternal grandparents first and failed to make a decision on the grandparents' petition *before* considering placement with any other petitioning party. The statutory language directing the district court to "consider placement" with the children's relatives first does not envision the side-by-side comparison undertaken by the district court. Although the rules of procedure for adoption cases require the district court to consolidate competing adoption petitions and to "determine the order in which evidence will be presented," *see* Minn. R. Adopt. P. 42.02, subd. 2; Minn. R. Adopt. P. 43.02(f), these rules must be followed in a manner that is consistent with preserving the statutory order of priority. Here, although the district court properly consolidated the adoption peti-

tions for trial, the order for evidence presentation that the district court established was at variance with preserving the statutory priority. Consistent with the statutory directive to consider placement with relative petitioners first, the grandparents should have proceeded first with their evidence at trial.[1] Given the required "individualized determination of the needs of the child," Minn.Stat. § 259.57, subd. 2(a), and the statutory order of priority imposed for placement considerations, I conclude that the district court's analysis was procedurally flawed because the district court did not make a decision on the grandparents' petition *before* considering whether adoption by the foster parents would serve the best interests of the children.

I reach this conclusion notwithstanding the district court's statement that the grandparents' petition "shall be considered first." Rather than considering the grandparents' petition first, the district court engaged in a factor-by-factor comparison between the petitions of the grandparents and the foster parents. A sequential consideration, rather than a consolidated or side-by-side comparison of competing adoption petitions, is mandated by the statutory order of priority for placement consideration. Minn.Stat. § 259.57, subd. 2(c). If, after addressing each factor with regard to a prospective relative placement, the district court determines that a child's best interests are served by granting the relative's adoption petition, then there is no need to consider "placement" with any other petitioner because the child's needs

will be met by granting the relative's petition. *See* Minn.Stat. § 259.57, subd. 1(a) (2012) ("[I]f the court finds that it is in the best interests of the person to be adopted that the petition be granted, a decree of adoption shall be made"). If, on the other hand, the district court considers the relevant factors with respect to a prospective placement with a relative and concludes that the child's best interests are not served by that placement, the petition must be denied. Then, following the order of priority, the petition of an "important friend with whom the child has resided" can be considered. *See* Minn.Stat. § 259.57, subd. 1(b) ("[I]f the court is not satisfied that the proposed adoption is in the best interests of the person to be adopted, the court shall deny the petition"); *id.*, subd. 2(c) (stating that the court "shall consider placement consistent with the child's best interests, and in the following order: ... (2) an important friend with whom the child has resided"). Therefore, I agree with the dissent's conclusion that a side-by-side, simultaneous analysis of competing adoption petitions renders the statutory phrase "in the following order" superfluous.

Contrary to Justice Page's dissent, however, I conclude that the district court's procedural error in the order in which it considered these adoption petitions was not prejudicial. Nor does this procedural error warrant a remand. The district court found, and the record supports, that most aspects of the best interests factors are virtually equal for the grandparents

---

1. In a pretrial order, the district court established the order of the evidence as follows: (1) the foster parents; (2) the paternal grandparents; (3) the Department of Human Services; and (4) the guardian ad litem. *In re S.G. & L.G., In re D.D. & L.D.*, Nos. 27–JV–FA–11–60, 27–JV–FA–11–87, Order at 3 (Henn. Cty. Dist. Ct. filed Apr. 20, 2011). Had the evidence been presented in an order consistent with the statutory priority set forth in section 259.57, the order of evidence would have avoided subjecting the children's grandmother to cross-examination in the foster parents' case-in-chief *before* she provided any direct testimony—a circumstance that likely heightened tensions in this emotionally-charged proceeding.

and the foster parents.[2] Thus, the district court's placement decision ultimately rested on its consideration of the impact of a change in placement on these particular children. For this aspect of the children's best interests, the evidence regarding these parties is not equal.[3]

With the exception of the evidence introduced by the foster parents on the impact of a change in placement on the children, much of which was stipulated to by the grandparents, the record is silent as it pertains to the grandparents' petition on this important component of the best-interests analysis. *See* Minn. R. Adopt. P. 41.04 ("The petitioner shall prove by a preponderance of the evidence ... that the adoption is in the best interests of the child"); *see also In re Welfare of D.L.*, 486 N.W.2d 375, 378 (Minn.1992) (noting the "disagreement among the six experts" who testified at trial about the severity of harm to a child that can result from a change in placement, and that the trial court "credited [the] view" of experts testifying in support of relatives); *State v. Myers*, 359 N.W.2d 604, 611 (Minn.1984) (noting a party "is free to test the value of the expert's testimony through cross-examination and,

when appropriate, presentation of his own expert witnesses"). Yet the best interests of the children could not have been ascertained without consideration of the impact of the proposed move on these young children. *See In re Petition to Adopt S.T. & N.T.*, 512 N.W.2d 894, 898 (Minn.1994) (noting that the "fundamental purpose" of adoption is to "determine the best interests of the child," and therefore the district court "must be free to examine all relevant evidence" to decide whether "the particular situation of the child" requires that a petition be granted or denied). Indeed, any consideration of best interests that did not address the impact of a move to another household on these children, whose adjustment to a new setting could be affected by their history of cocaine exposure, would have been incomplete. And any conclusions drawn without this consideration would have been unreliable.

Although consideration of this aspect of the children's best interests was essential in this case, the grandparents did not offer any affirmative evidence on the impact of the proposed move on the children. The only evidence as to this aspect of the children's best interests was offered by the

2. Regarding the heritage and culture factor, the district court observed that the children's cultural needs will become more significant as they grow older. The district court also found the foster parents credible when they indicated that they will facilitate a relationship with the children's biological family, as they have done for their adopted son. But D.D., the children's grandmother, appears to be excluded from the family members with whom the foster parents would facilitate a relationship because the foster mother testified that she had "changed her mind" over the course of the proceedings and opposed the children's relationship with their grandmother. On appeal, we can neither reweigh the credibility determinations of the district court, nor substitute our judgment for the district court's findings. *In re Welfare of D.L.*, 486 N.W.2d 375, 380 (Minn.1992) ("[T]he trial court retains broad discretion because of

its opportunity to observe the parties and hear the witnesses."). But I cannot forgo the observation that any decision by the foster parents to exclude the children's grandmother from a relationship with the children because she exercised her legal rights and aggressively pursued the adoption of her grandchildren out of love for her family is both shortsighted and antithetical to the interests of these children.

3. Here, the grandparents' ability to meet the children's special needs arising from the children's prenatal exposure to cocaine and other illegal drugs need not be separately addressed because, as the district court's conclusions reflect, the adverse impact of a change in placement on the children was based in part on the children's special needs.

foster parents; and the evidence was largely uncontroverted. The grandparents argue before us that the testimony of the children's doctor and the expert witness does not have the credibility conferred by the district court. This argument is unavailing. Although a district court can find uncontroverted evidence unpersuasive or unhelpful, it did not do so here. And as an appellate court, we are ill-suited to assess the weight of this largely uncontroverted evidence and the credibility of the witnesses offering it. *See In re the Adoption of C.H.*, 554 N.W.2d 737, 743 (Minn.1996) ("The trial court had the best opportunity to observe the various witnesses and assess their credibility and its conclusions cannot be said to be clearly erroneous."); *In re Welfare of D.L.*, 486 N.W.2d at 380 ("[T]he trial court retains broad discretion because of its opportunity to observe the parties and hear the witnesses.").

In sum, I agree with Justice Page's dissent that the district court failed to adhere to the statute when the district court considered the parties' competing adoption petitions side-by-side. However, the district court's consideration of the impact of relocating these children and the evidence addressing that impact was not only essential but also inevitable in this case. Because the only evidence in the record on this factor was the evidence offered by the foster parents, any error in the order in which the district court considered the adoption petitions was harmless. I, therefore, conclude that the district court did not abuse its discretion by denying the grandparents' petition and granting the foster parents' petition. Accordingly, I dissent in part but concur in the judgment.

PAGE, Justice (dissenting).

I respectfully dissent.

This case requires us to interpret Minnesota Statutes § 259.57 (2012). That statute provides, in relevant part:

> In reviewing adoptive placement and in determining appropriate adoption, the court shall consider placement, consistent with the child's best interests and in the following order, with (1) a relative or relatives of the child, or (2) an important friend with whom the child has resided or had significant contact.

Minn.Stat. § 259.57, subd. 2(c). A key provision of the statute is the requirement that the district court consider "placement" in the specified order of relatives first, and important friends second. The determination of whether a given placement is in the best interests of the child requires district courts to consider a variety of factors, including the child's history, functioning, and behaviors; the child's educational, developmental, medical, religious, and cultural needs; and the child's interests, talents, and connection with a community or school. Minn.Stat. § 260C.212, subd. 2(b) (2012).

### A. Statutory Interpretation

When interpreting a statute, our goal is to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012). "We determine legislative intent primarily from the language of the statute itself." *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn.2010) (internal quotation marks omitted). If the statute is unambiguous, we apply the plain meaning of the statutory language. *See* Minn.Stat. § 645.16. Only if the statutory language is ambiguous may we look beyond the language of the statute to such things as the legislative history of the law. *Id.*

The central dispute in this case concerns the meaning of the statutory requirement that the district court consider placement *"in the following order."* Under the

court's interpretation of this requirement, it is enough that the district court *thinks about* a relative's petition with respect to each statutory best interest factor before considering a foster parent's petition on that same factor. But there are several problems with this interpretation. First, the court's interpretation ignores the express language of the statute, which requires that "placement" be considered in the specified order, not that the statutory best interest factors be considered in the specified order. The court's interpretation conflates consideration of placement with consideration of the best interest factors. Second, there is no way to know with any certainty in what order the district court thought about competing petitions, which makes the district court's decision very difficult to review.[1] Third, and most importantly, the court's interpretation allows the district court to evaluate and analyze competing adoption petitions from relatives and important friends *side-by-side, and at the same time*, thus rendering the Legislature's use of the words "in the following order" effectively meaningless and superfluous.[2] *See Am. Family Ins. Group*

*v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000) (stating that we should, whenever possible, interpret a statute "to give effect to all of its provisions" and ensure that "no word, phrase, or sentence [is] deemed superfluous, void, or insignificant"); *see also* Minn.Stat. § 645.16. The Legislature's command that competing petitions be considered in a specified order is incompatible with the court's reading of the statute that allows an important friend's petition to be effectively considered *together with* a relative's petition. Thus, the court's interpretation reads the words "in the following order" out of the statute.

In my view, there is only one way to read the statute to give effect to all of its language. When faced with multiple petitions for adoption, the district court must "consider placement" first with petitioners who are related to the child, and evaluate the relative's petition using the statutory best interest factors of section 260C.212, subdivision 2(b). If such placement is "consistent with the child's best interests," then the district court must award placement to the relative.[3] If the district court

---

1. Typically, the only evidence an appellate court will have of the district court's order of consideration of competing petitions is the written decision. Thus, in order to survive appellate scrutiny under the court's interpretation of section 259.57, subdivision 2(c), the district court must merely arrange the written decision to place its discussion of the relatives' petition first on each statutory best interest factor. In other words, the court's interpretation of the statute ignores the substance of the district court's analysis, and makes the form and structure of the written decision the ultimate consideration. In addition to elevating form over substance, the court's interpretation may also implicate separation-of-powers concerns, as it is unclear to what extent the Legislature has authority to dictate how courts organize and structure their written decisions.

2. The court contends that "[t]he consideration requirement is not meaningless ... because if

both the relative and nonrelative petitioners are equally qualified to adopt and the best interests analysis renders an equivalent result as to each party, the relative would benefit from being considered first and could proceed with the adoption." It appears that the court is saying that, in the case of a tie, the order-of-consideration provision requires the district court to award a tiebreaker to the relatives. But this conclusion has absolutely no foundation in the statutory language, which does not mention "ties" or situations in which parties are "equally qualified." Interestingly, the court's interpretation reinstates a "preference" in favor of relatives that the court acknowledges the statute no longer allows.

3. Although not at issue here, if more than one relative is petitioning for adoption, the court may consider them all together, and must award placement (assuming that placement with at least one of the relatives is in the

concludes that placement with a relative is *not* consistent with the child's best interests, the court must then proceed to "consider placement" with the next statutory category of potential adoptive parents: "important friends." The competing petitions are not to be considered contemporaneously, or side-by-side. Rather, the relative's petition is considered in its totality— and a decision is made on the petition— before consideration of the petition of an important friend. In other words, under my interpretation, the language of section 259.57, subdivision 2(c), imposes an *order of priority* between competing classes of petitioners. Such an interpretation gives substantive meaning to the requirement that the district court "consider placement" in a specified order.

Justice Paul Anderson's concurrence contends that the statute's use of the term "best interests" requires comparison between competing petitioners. But the concurrence overlooks the fact that the actual phrase used by the statute is that the court should consider placement *consistent with* the child's best interests." The Legislature's use of the words "consistent with" suggests that there may be cases when multiple placement options meet a child's best interests and greatest needs. In other words, competing petitioners may both offer loving, supportive, and nurturing homes for the child. In those cases, I do not believe that the Legislature intended that relatives—who can meet the child's needs and offer a loving home—be passed over merely because nonrelatives may be marginally "better" in some sense, such as

being more affluent or better educated than the relative, or having spent more time with the child. The Legislature would not have intended to systematically disfavor relatives in such circumstances absent a specific finding that placement with the relative would be inconsistent with the best interests of the child. If the Legislature had intended for us to read the statute the way the concurrence suggests, there would have been no reason to require courts to consider placement in a particular order, and absolutely no reason to distinguish between relatives and others. The Legislature would have simply required consideration of "all petitions" in light of the child's best interests.[4]

In support of its conclusion that the district court may properly consider the petition of an important friend at the same time it is considering a relative's petition, the court makes much of the fact that the previous version of the statute used the word "preference," and the present version of the statute does not. At the outset, I note that consideration of the "former law" is inappropriate unless the court first determines the present law is ambiguous, which it is not. Minn.Stat. § 645.16. But even if it were appropriate to consider the former version of section 259.57, the former law's reference to a "preference" does not support the court's reading. A "preference" means that the district court should consider *each and every* adoption petition, but give some *extra weight* to the preferred class of petitioners. *See In re Adoption of C.H.*, 554 N.W.2d 737, 742

child's best interests) to the relative placement that would be *most consistent* with the child's best interests.

**4.** As for the concurrence's analogy to looking both ways before crossing the street, it is enough to say that the Legislature was not providing instructions on how to cross the street in amending Minn.Stat. § 259.57, subd.

2(c). It was, however, recognizing the important and powerful role that family plays in human relationships and the development of the human species. In requiring that a relative's petition be considered first, the Legislature sought to protect the family bond to the extent that it was not inconsistent with the child's best interests.

(Minn.1996) (a preference is one factor to be considered and may be overcome by a sufficient showing). I agree with the court that the change in the statutory language indicates that district courts may no longer apply a "preference" for relatives. But the current statutory language does not impose a preference. Rather, as previously noted, the statute imposes an order of priority. A "priority" is defined as "something requiring or meriting attention *prior to competing alternatives.*" *Webster's Third New International Dictionary Unabridged* 1804 (3d ed.2002) (emphasis added). Thus, with the 1997 change in the statute, the district court no longer considers all petitions at once, giving certain petitions extra weight, but considers certain categories of petitions *before* other competing petitions. No class of petitioners is preferred. Instead, the district court must "consider[ ] placement," one class of petitioners at a time, in the Legislature's specific and defined order of priority.

Moreover, the court's review of the former law is superficial. The legislative history surrounding the 1997 amendments to the statute confirms my reading of the plain and unambiguous language of section 259.57. In August 1996, Congress enacted a law prohibiting *states* from denying a person the opportunity to become an adoptive parent or a foster parent, or delaying or denying the placement of a child, "on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved." *Pub.L. No. 104–188, 1808, 110 Stat. 1755, 1903–04 (1996).* The law provided for significant penalties in the form of funding cuts for states that failed to comply with its provisions. *See id.*

In response to this federal directive, a bill was introduced on January 27, 1997, to amend the Minnesota adoption and foster care statutes. The bill proposed to remove language that allowed for the consideration of race, color, or national origin in determining a child's adoptive or foster placement. *See* H.F. 209, 1997 Minn. Leg., 80th Sess. (Jan. 27, 1997) (as introduced), *available at* https://www.revisor.mn.gov/bin/bldbill.php?bill=H0209.0&session=ls80. With respect to section 259.57, the bill proposed to remove the provisions that stated a "preference" for placement of the child with a relative or with an individual with "the same racial or ethnic heritage as the child" if placement with relatives would be detrimental or was not possible. *See id.,* § 10. Instead, the bill amended section 259.57, subdivision 2(c), to read as follows:

> The authorized child-placing agency shall, consistent with the child's best interests, consider placement with a relative or relatives of the child, or, *if a relative is not available,* an important friend with whom the child has resided or had significant contact.

*Id.* (emphasis added). Thus, as introduced, the bill's language required courts to consider placement, consistent with the child's best interests, with a relative or relatives. Only if a relative was "not available" was placement with an important friend permitted.

After the bill was introduced, the House Committee on Health and Human Services held a hearing to elicit testimony on the proposed amendments. A representative from the Minnesota Department of Human Services (MDHS) testified that the "issue of relative preference was the single most important issue" in the Department's discussions in the months leading up to the introduction of the bill. *Hearing on H.F. 209 Before the H. Comm. on Health and Human Servs.,* 1997 Minn. Leg., 80th Sess. (1997) (testimony of Erin Sullivan Sutton, MDHS representative) (recording

on file with the Minnesota Historical Society). The MDHS representative further stated that "the bill *maintains* the Department at least ... consider placement ... first with a relative and secondly with important friends." *Id.* (emphasis added).

The Committee subsequently adopted proposed changes to the original language that, without objection from the bill's authors, simplified the bill's language. This simplified language was included in the final version of the bill that was enacted by the Legislature. In the end, all five authors of the original bill voted to pass the bill as amended by the Committee.

As the legislative history confirms, the 1997 amendments were not intended to diminish the statutory emphasis on placing children with relatives. The authors of the amendments were no doubt concerned that eliminating race as a consideration in adoptive and foster care placements might have the unintended effect of decreasing the likelihood that children from racial minorities would be adopted by relatives. One way to mitigate these potential negative effects was to strengthen the statutory emphasis on placement with relatives by requiring that placement with relatives be considered before placement with others. By amending section 259.57, subdivision 2(c), to provide for an order of priority in favor of relatives, that is exactly what the Legislature did.

In this case, the district court believed that the grandparents "love the children" and are capable of meeting both their physical and medical needs, even in light of the children's "current functioning and behaviors." Nevertheless, the district court was concerned about the grandparents' "ability to recognize the children's need for services and seek out additional services if necessary" and, as a result, awarded placement with the foster parents. It did so without explicitly concluding, one way or the other, that placement with the grandparents was inconsistent with the best interests of the children. I would hold that the district court erred in considering placement with the foster parents absent such a finding because the district court did not finish "consider[ing] placement" with the grandparents until it determined whether placement with the grandparents was, or was not, consistent with the best interests of the children. Accordingly, I would vacate the district court's order and remand [5] for a determination of whether placement with D.D. and L.D. is consistent with the children's best interests *before* proceeding to consider placement with S.G. and L.G.[6]

5. The Supreme Court of the United States has held that it is an "elementary" rule of appellate review that, when a district court's findings are insufficient—or when the district court has failed to make a finding—"because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings." *Pullman–Standard v. Swint,* 456 U.S. 273, 291–92, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Here, the district court failed to find that placement with the grandparents was inconsistent with the children's best interests. Because "[f]actfinding is the basic responsibility of district courts, rather than appellate courts," *id.* at 291, 102 S.Ct. 1781, we cannot and should not speculate as to what the district court would have found had it correctly applied the law.

6. Even under the court's interpretation of Minn.Stat. § 259.57, subd. 2(c), I would conclude that the district court abused its discretion. The court concludes that subdivision 2(c) requires the district court to "think carefully and form an opinion about the grandparents' petition before considering the petition of the foster parents." But the district court analyzed aspects of each petition in an alternating fashion throughout its order, which directly contravenes the court's interpretation of subdivision 2(c).

## B. Factors Considered by the District Court

After reviewing the record in detail, I am also troubled by certain findings and conclusions upon which the district court relied in granting placement with S.G. and L.G. First, the district court's concern that D.D. and L.D. would not adequately attend to P.U.K. and D.F.K.'s special needs was central to its decision placing the children with the foster parents. The district court stated that D.D. was "unable to identify any of the [children's] special needs except for [P.U.K.'s] difficulty sleeping," which, according to the court, suggested that D.D. and L.D. "do not acknowledge that the girls *already* have special needs." It is not clear to me, however, on the record before us that the children's needs are meaningfully different from the diverse array of needs that normally accompany children of their respective ages.

The extent of the children's "special needs" as described in the record are as follows. P.U.K. is three years old; is "feisty" and "high-spirited"; makes good eye contact; and is loving, affectionate, and gentle. She is sensitive, and often gets tense, irritable, and weepy in response to stimulation or pain. She has difficulty sleeping and is afraid of the dark. She does not "do well" with changes or surprises. Although she is slow to reach milestones, she is currently "on track."

D.F.K. is two years old. She is "very smiley," makes good eye contact, and usually sleeps through the night. She has a lot of "stranger anxiety" and does not like loud noises or a lot of commotion. She likes attention and being held. Although she is two to three months behind "where she should be developmentally," the delays are not significant enough for her to qualify for special services through the school district.

In my experience, the social and emotional characteristics of P.U.K. and D.F.K. are hardly uncommon for children of their respective ages. Certainly, many parents deal with three-year-olds who are sensitive, who cry in response to over-stimulation or pain, and who have problems sleeping. Likewise, it is not extraordinary for a two-year-old to be attached to caregivers, sensitive to loud noises, and to like being held. Information on developmental milestones published by the Centers for Disease Control and Prevention would seem to support my experience. *See* Ctrs. for Disease Control & Prevention, *Important Milestones: Your Child at Three Years*, http://www.cdc.gov/ncbddd/actearly/milestones/milestones–3yr.html (last visited Jan. 22, 2013) (describing social and emotional milestones for a three-year-old, which include showing affection for friends without prompting, displaying a wide range of emotions, and getting upset with changes in routine); Ctrs. for Disease Control & Prevention, *Important Milestones: Your Child at Two Years*, http://www.cdc.gov/ncbddd/actearly/milestones/milestones–2yr.html (last visited Jan. 22, 2013) (describing social and emotional milestones for a two-year-old, which include showing defiant behavior and getting "excited" when around other children). It is true that the district court considered the testimony of an expert witness, Dr. Sandra Hewitt, as well as the children's pediatrician, Dr. Daniel Noonan, both of whom recommended that the children remain with the foster parents. However, the record is silent as to any testing performed or specific diagnoses reached by these professionals. The record does indicate that both children were referred to an early childhood education program for testing, but D.F.K. did not qualify for services and P.U.K is "currently on track" with her developmental milestones.

P.U.K. and D.F.K. may in fact have diagnosable special needs. I simply do not see how that conclusion can be reached on the record before us. Therefore, I question how the district court could fault D.D. and L.D. for not "recogniz[ing] the children's need for services" and being able to "identify any of the [children's] special needs except for [P.U.K.'s] difficulty sleeping." Moreover, such conclusions are further undermined by the fact that D.D. and L.D. live in Mississippi and are rarely able to spend time with the children, which would understandably account for a less-detailed knowledge of the needs that are unique to the children.

Second, I am concerned that the district court placed undue emphasis on the fact that the children have remained with the foster parents since birth. In rendering its decision, the district court discusses at length the attachment that the children have to S.G. and L.G., emphasizing that the children "are currently in a home where all of their needs are being met" and that they have formed "secure and healthy attachment[s]." I do not disagree that these facts are relevant to a placement analysis pursuant to Minn.Stat. § 259.57, subd. 2(c). However, if, as the court suggests, Minn.Stat. § 259.57, subd. 2(c), does not provide any preference for parties seeking to adopt, district courts should be careful not give too much weight to the presence of children with foster parents because such a practice will result in a de facto preference. I fear that the district court's decision in this case did exactly that.

Finally, I am troubled by the guardian ad litem's "impression" that, because D.D. refers to the children as "her blood," she somehow "thinks of the children as possessions." Although the degree to which the district court relied on this impression in awarding custody to the foster parents is unclear, I make particular note of this finding in the record because I believe it is rooted in a deep cultural misunderstanding. In my view, D.D.'s reference to the children as "her blood" emphasizes not that the children are her possessions, but that, as blood relatives, they share a bond that exceeds all others. D.D.'s words appear to do nothing more than reflect her desire to take responsibility and care for the children because of the familial bonds that she has with them. Viewed in this light, although it may have been sincere, the guardian ad litem's impression was misguided. Accordingly, the district court should not have given the guardian ad litem's impression any weight in making its decision.

For the reasons discussed above, I would vacate the district court's adoptive placement order and remand to the district court to consider the petition of D.D. and L.D. in the order of priority required by Minn.Stat. § 259.57, subd. 2(c).

STRAS, Justice (dissenting).

I join in the dissent of Justice Page, except its lengthy discussion of Minn.Stat. § 259.57's legislative history.