*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1358**

In the Matter of the Welfare of the Children of:
V. R. R. and M. A. H., Parents,
Commissioner of Human Services, Legal Custodian.

**Filed April 8, 2024
Affirmed
Bjorkman, Judge**

Wadena County District Court
File No. 80-JV-19-977

Paul B. Hunt, Karkela, Hunt & Cheshire, PLLP, Perham, Minnesota (for appellant J.F.)

Kyra L. Ladd, Wadena County Attorney, Brent J. Peterson, Assistant County Attorney, Wadena, Minnesota (for respondent Wadena County Human Services)

Angela Sonsalla, Perham, Minnesota (for respondent guardian ad litem)

Considered and decided by Larkin, Presiding Judge; Ross, Judge; and Bjorkman, Judge.

**NONPRECEDENTIAL OPINION**

**BJORKMAN**, Judge

Appellant challenges the denial of her motion for adoptive placement of her grandchild, arguing that the district court abused its discretion by determining that the child's best interests favor adoption by non-relative foster parents. We affirm.

## FACTS

Appellant J.F. is the maternal grandmother of J.J.R., born October 1, 2018. In November 2018, respondent Wadena County Human Services (the county) commenced a child-protection proceeding regarding J.J.R. and placed him with grandmother and her husband, R.F. At that time, grandmother had a family-foster-care license and was already caring for J.J.R.'s older half-sibling J.J.H.F. In March 2021, the district court involuntarily terminated the parental rights of J.J.R.'s biological parents. The following month, grandmother adopted J.J.H.F.

The county intended grandmother and R.F. to be J.J.R.'s permanent adoptive placement. In May 2021, grandmother received an updated home-study assessment. The following month, J.J.R.'s younger sibling, J.U.R., was born. Todd County Human Services immediately petitioned to terminate the parental rights of J.U.R.'s parents and J.U.R. was placed with grandmother. In November, the county submitted an adoption-assistance application for grandmother to adopt J.J.R.

J.J.R. and J.U.R. remained in grandmother's care until December 13, 2021, when they were removed following several child-maltreatment reports.[1] On December 10, law-enforcement officers were called to the home because of a domestic incident between grandmother and R.F. While speaking with grandmother, officers observed that she smelled of alcohol and had slurred speech. R.F. admitted consuming alcohol and was arrested.

---

[1] At the time the maltreatment reports were filed, J.J.H.F. was eight years old, J.J.R. was three years old, and J.U.R. was five months old.

The next day, grandmother called law enforcement reporting that three individuals had entered her home, yelling that a hurricane was coming. The responding officers observed the door was locked and there were no individuals in or around the house. Grandmother appeared "frantic," visibly shaken, and admitted drinking vodka. She also acknowledged that R.F.'s arrest and caring for the three children on her own was "stressful."

On December 13, law-enforcement officers accompanied county social workers to grandmother's home to remove J.J.R. and J.U.R. They arrived at approximately 1:00 p.m. and "knocked on the door several times" before it was answered by grandmother's adult stepson. The social workers found grandmother lying in bed, looking "dazed." Grandmother admitted consuming alcohol, but refused to take a preliminary breath test (PBT). Social workers found J.J.R. in his bedroom behind a baby gate and J.U.R. alone in a separate room with a soaked diaper and wet clothing. Law enforcement officers observed a knife lying on a pile of clothing that J.J.R. could easily reach. Grandmother's stepson told the officers that grandmother was suicidal and had "a history of self-harming by cutting and making suicidal threats." The officers found and confiscated a loaded handgun from grandmother's truck.

Later that same day, other law-enforcement officers performed a welfare check on J.J.H.F. When they encountered grandmother, she exhibited signs of intoxication. She

admitted drinking alcohol and a PBT revealed an alcohol concentration of 0.394. As a result, the officers removed J.J.H.F. from grandmother's home.[2]

When interviewed, then eight-year-old J.J.H.F. explained that grandmother "drinks a lot," often becoming sick or engaging in physical altercations with R.F. He admitted that grandmother's behavior frightened him. R.F. shared J.J.H.F.'s concerns, reporting that grandmother had struggled with excessive drinking for years. Later that day, other family members reported that grandmother was "suicidal, acting crazy and looking for [R.F.'s] gun."

In January 2022, the county determined that grandmother committed maltreatment as to J.J.R. and J.U.R. based on the positive PBT result and "concerns that [grandmother's] alcohol consumption impaired her ability to provide supervision for [J.J.R.]," which had been present "for a significant amount of time." At that time, grandmother's foster-care license was already under investigation and rendered inactive.[3] In May, the county recommended that the department of health and human services (the department) revoke grandmother's license. The department later did so based on the maltreatment determinations and other foster-care-licensing violations. Grandmother did not appeal the revocation.

---

[2] The county offered grandmother a case plan to reunify with J.J.H.F. Grandmother successfully completed the plan and J.J.H.F. was returned to her home in February 2022.

[3] Minn. Stat. § 245A.04, subd. 1(c) (2022), prohibits individuals who hold foster-care licenses from being "under the influence of a chemical that impairs the individual's ability to provide services or care."

On May 26, grandmother moved to be considered an adoptive placement for J.J.R.[4] The district court determined that grandmother made a prima facie showing that the county had acted unreasonably in failing to consider her for adoptive placement of J.J.R. and ordered an evidentiary hearing. As the district court found in its later order denying grandmother's motion, the parties "seemingly agreed to defer conducting the evidentiary hearing until the proposed adoption was actually ready to be filed." That did not occur until March 2023, when the adoption agreement designating J.J.R.'s foster parents as his adoptive placement was fully executed.

During the August 2023 evidentiary hearing, the district court received 133 exhibits and testimony from five witnesses: J.J.R.'s post-permanency case manager, two experts, and two county social workers assigned to J.J.R.'s case. All of the witnesses who commented on grandmother's proposed adoptive placement testified that such a placement would not be in J.J.R.'s best interests.[5] Both experts testified that J.J.R. experienced significant trauma from moving between multiple foster homes since he was removed from grandmother's care, and that further disruption would be harmful. And they both opined that it is in J.J.R.'s best interests to be placed for adoption with his current foster parents— with whom he and his younger sibling had lived for over a year.

---

[4] In a separate proceeding in Todd County, grandmother moved to be considered an adoptive placement for J.U.R. The Todd County District Court denied grandmother's motion because she failed to file a valid adoption home study or an affidavit that met the requirements of Minn. Stat. § 260C.607, subd. 6(a)(1) (2022). This court recently affirmed that decision. *In re Welfare of V.R.R.*, 2 N.W.3d 587, 593-95 (Minn. App. 2024).

[5] In their written closing argument, the guardian ad litem (GAL) opined that it is in J.J.R.'s best interests to remain with his foster parents.

In a detailed and comprehensive 40-page order, the district court found that the county acted unreasonably in failing to place J.J.R. with grandmother for adoption. But it ultimately determined that it is not in J.J.R.'s best interests to be adopted by grandmother. Accordingly, the district court denied grandmother's motion for adoptive placement of J.J.R.

Grandmother appeals.

## DECISION

We review the denial of a motion for adoptive placement for an abuse of discretion. *In re Welfare of L.L.P.*, 836 N.W.2d 563, 570-71 (Minn. App. 2013); *see also* Minn. Stat. § 260C.607, subd. 6(f) (2022) (providing that the district court "may" order relative adoptive placement if the agency unreasonably fails to make the requested placement). A district court abuses its discretion when it makes findings of fact that lack evidentiary support, misapplies the law, or resolves the discretionary question in a manner that is contrary to logic. *Woolsey v. Woolsey*, 975 N.W.2d 502, 506 (Minn. 2022). We review de novo whether the district court correctly applied the law. *In re A.R.M.*, 611 N.W.2d 43, 47 (Minn. App. 2000). But we review the district court's factual findings for clear error. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021); *see also Ewald v. Nedrebo*, 999 N.W.2d 546, 552 (Minn. App. 2023) (applying *Kenney* to a district court's best-interests findings), *rev. denied* (Minn. Feb. 28, 2024). Under the clear-error standard, we do not reweigh the evidence, engage in fact-finding, or reconcile conflicting evidence. *Kenney*, 963 N.W.2d at 221-22.

We begin our analysis by reviewing the statutory framework for adoptive placements. Following termination of parental rights, the district court must order guardianship of the child to the commissioner of human services, a licensed child-placing agency, or someone who is capable and willing of assuming duties and responsibilities to the child. Minn. Stat. § 260C.325, subd. 1(a)(1)-(3) (2022). When the commissioner assumes temporary guardianship, the responsible county has a duty to make reasonable efforts to finalize the child's adoption. Minn. Stat. § 260C.601, subd. 2 (2022).

Reasonable efforts include conducting a comprehensive search for suitable relatives, including grandparents. Minn. Stat. § 260C.221, subd. 1(a)-(b) (2022). The child's relatives must be considered before the county explores other permanency options. Minn. Stat. § 260C.212, subd. 2(a) (2022). Most importantly, the county must "ensure that the child's best interests are met by requiring an individualized determination of the needs of the child" and how the selected placement will serve those needs. *Id.* The district court must review the county's reasonable efforts and progress toward adoption at least every 90 days. Minn. Stat. § 260C.607, subd. 1(a) (2022).

After a child is ordered under the guardianship of the commissioner, a child's relative or foster parent may file a motion seeking an order for adoptive placement of the child. Minn. Stat. § 260C.607, subd. 6 (2022). If the moving party has a valid adoption home study and makes "a prima facie showing that the agency has been unreasonable in failing to make the requested adoptive placement," the district court must hold an evidentiary hearing. *Id.*, subd. 6(a)(1), (b), (c).

At the evidentiary hearing, the moving party has the burden to prove by a preponderance of the evidence that the county "has been unreasonable in failing to make the adoptive placement." *Id.*, subd. 6(d). If the moving party meets this burden, the district court *may* order the county to place the child with the moving party for adoption, if the district court finds that it is in the child's best interests to do so. *Id.*, subd. 6(f) (requiring findings that the moving party is the "most suitable adoptive home" for the child based on the 11 best-interests factors listed in Minn. Stat. § 260C.212, subd. 2(b) (2022)); *see* Minn. Stat. § 645.44, subds. 15, 15(a) (2022) (defining "[m]ay" as permissive and "[m]ust" as mandatory, respectively); *In re Welfare of Child of J.D.T.*, 946 N.W.2d 321, 328 (Minn. 2020) (citing Minn. Stat. § 645.44, subds. 15, 15(a) (2018)).

Grandmother challenges the district court's best-interests findings, arguing that the record does not support them and that the court improperly weighed the evidence. The county and GAL contest the district court's finding that the county was unreasonable in declining to place J.J.R. with grandmother for adoption, arguing that the district court misapplied the law and otherwise abused its discretion by making findings unsupported by the record. We turn first to grandmother's argument because the best-interests issue is dispositive.

## I. The district court did not abuse its discretion by determining that adoptive placement with grandmother is not in J.J.R.'s best interests.

As noted above, a district court may grant a motion for adoptive placement only if it finds that the agency was unreasonable in failing to place the child with the moving party *and* that placing the child with the moving party is in the child's best interests. Minn. Stat.

8

§§ 260C.212, subd. 2(b) (enumerating 11 best-interests factors), .607, subd. 6(f) (authorizing adoption with the moving party only when "the moving party is the most suitable adoptive home to meet the child's needs using the factors in section 260C.212, subdivision 2, paragraph (b)"). The best-interests factors include:

> (1) the child's current functioning and behaviors; (2) the medical needs of the child; (3) the educational needs of the child; (4) the developmental needs of the child; (5) the child's history and past experience; (6) the child's religious and cultural needs; (7) the child's connection with a community, school, and faith community; (8) the child's interests and talents; (9) the child's current and long-term needs regarding relationships with parents, siblings, relatives, and other caretakers; (10) the reasonable preference of the child, if the court, or the child-placing agency in the case of a voluntary placement, deems the child to be of sufficient age to express preferences; and (11) for an Indian child, the best interests of an Indian child as defined in section 260.755, subdivision 2a.

Minn. Stat. § 260C.212, subd. 2(b). Based on the number of statutory factors and "the overall best interests standard," we afford a district court "a substantial degree of latitude" in making its best-interests determination. *In re S.G.*, 828 N.W.2d 118, 125-26 (Minn. 2013) (quotation omitted). But the court "must make detailed factual findings showing that the child's best interests are being served." *Id.* at 126 (quotation omitted).

After analyzing each best-interests factor, the district court determined that factors one (current functioning and behavior), five (history and past experience), seven (connection to community and school), and nine (relationship to current caretakers, parents, siblings, and relatives), weighed in favor of placing J.J.R. with his foster parents. The court found that factor six (religious and cultural needs) weighed in favor of placing J.J.R. with grandmother and the remaining factors were either neutral or did not apply.

9

The district court made underlying findings with respect to these factors. At the time of trial, it is undisputed that J.J.R. had been in out-of-home placement for 1,715 days and relocated at least five times. The district court found that these circumstances caused J.J.R. significant trauma. The court also found that J.J.R.'s foster parents are ready and capable of addressing his special needs as a "neurodivergent" child; J.J.R. had developed a connection with his foster parents' church and community after living with them for the last 12 months; J.J.R. formed a secure attachment with his foster parents and younger sibling J.U.R., who also lived with them; and J.J.R. has made significant progress with emotional regulation, which would be irreparably harmed if he were to be removed from the care of his foster parents. The district court found that grandmother was better suited to meet J.J.R.'s cultural needs because she shares his Hispanic and African-American heritage, and that J.J.R. had some attachment to grandmother. But it determined that at the time of the hearing, it "would not be in the best interests of [J.J.R.] to be placed with [grandmother] for adoption." Citing the testimony of the two experts, the district court found that "[t]he undisputed evidence is that [J.J.R.] has improved in nearly every identifiable measure over the course of the past year," and that it was "doubtful" J.J.R. would have made the same progress in grandmother's care.

Grandmother urges this court to reverse, arguing that (1) the district court gave undue weight to the experts' testimony when neither expert had observed J.J.R. with grandmother, J.J.H.F., or R.F.; (2) the conduct that led to J.J.R.'s out-of-home placement was an isolated incident and nothing in the record suggests that grandmother was unable to care for J.J.R. at the time of the evidentiary hearing; and (3) the harm that will result

10

from separating J.J.R. from his familial caregivers outweighs the potential harm that may result from separating him from his foster parents. We address each argument in turn.

First, we discern no error by the district court in crediting and relying on the experts' testimony. The first expert, a clinical social worker with 40 years of experience in child development, attachment, trauma, and adoption, testified that J.J.R.'s strong attachment to his foster parents made adoptive placement with them in his best interests. She reasoned that J.J.R. suffered repeated trauma from being in out-of-home placement for more than 1,715 days in at least five different foster homes, leaving "no doubt" that removing him from his foster parents would be harmful. She explained that J.J.R.'s foster parents were providing him with the "extraordinarily positive, empathic, [and] sensitive parenting" that J.J.R. needs as a neurodivergent child with behavioral challenges. And she noted that they have "an amazing support system."

J.J.R.'s therapist also testified as an expert in early childhood development, trauma, attachment, foster care, and adoption. He began working with J.J.R. in January 2023. During their early sessions, J.J.R. would dissociate and shut down emotionally when discussing uncomfortable topics—behavior indicative of past trauma. But over the course of their sessions and with support from his foster parents, J.J.R.'s ability to regulate his emotions had significantly improved. Like the clinical social worker, he opined that J.J.R. had developed a strong attachment to his foster parents and that removing him from their care "would be catastrophic to his mental health" and his ability to trust future caregivers. After stating that J.J.R.'s symptoms would not improve further until his placement is permanent, the therapist acknowledged that he was "honestly terrified" that if J.J.R. was

11

separated from his foster parents, he "would not be able to get [J.J.R.] back to the same level of mental health that [J.J.R. has] now." The district court found the therapist's testimony to be "extremely credible and persuasive."

Grandmother is correct that the experts did not personally observe J.J.R. with grandmother, J.J.H.F., or R.F. But we are not persuaded that this undermines the district court's best-interests assessment. In addition to the expert testimony, a county social worker testified that notes regarding the supervised visitation reveal that J.J.R. acted out and had toileting accidents when returned to the foster home after visits with grandmother.[6] Despite this evidence, the district court found that J.J.R. "has some attachment" to grandmother. But the court noted that it was far more confident that J.J.R. would maintain his secure attachment to his foster parents than it was confident that J.J.R. would develop a secure attachment to grandmother and R.F. It is not our role to second-guess the district court's credibility determinations or reweigh the evidence. *Kenney*, 963 N.W.2d at 223 (emphasizing "the role of an appellate court is not to weigh, reweigh, or inherently reweigh the evidence when applying a clear-error review").

Second, the district court's order reflects careful consideration of grandmother's ability to care for J.J.R. at the time of the evidentiary hearing. Indeed, the court stated that it would have preferred to receive more information about the current relationship between

---

[6] Grandmother also argues that the district court should not have credited the clinical social worker's testimony because she did not review the supervised-visitation notes. The record defeats grandmother's argument. The clinical social worker's report shows the records she reviewed in reaching her opinions include six supervised-visitation notes from March 2022 to April 2023.

J.J.R. and grandmother. But grandmother did not testify and did not call any witnesses. And contrary to her assertion, the district court did consider evidence that the conduct that led the county to remove J.J.R. from grandmother's care was isolated, finding it was "a single behavior incident." But after contrasting the fact that grandmother "may be able to support [J.J.R.'s] functioning and behavior" in the future with the foster parents' current ability to do so, the court concluded that "as things stand today," grandmother "is not the most suitable adoptive home to meet [J.J.R.'s] needs." Our careful review of the record convinces us that the evidence supports the district court's thoughtful determination.

Third, we are not persuaded to second-guess the district court's finding that the likely harm to J.J.R. if his adoptive placement with his foster parents is disrupted outweighs the preference given to relatives over non-relatives. *See* Minn. Stat. § 259.57, subd. 2(c) (2022). We acknowledge grandmother's concern that severing J.J.R.'s attachment to her and to his brother J.J.H.F. would be more harmful to J.J.R. in the long-term than separating J.J.R. from his foster parents, despite his secure attachment to them. While a child's attachment to caregivers is not an enumerated statutory best-interests factor, our supreme court has recognized that harm a child may experience if removed from foster parents with whom the child has formed a healthy attachment is an important aspect of the child's best interests. *Compare S.G.*, 828 N.W.2d at 126 (affirming denial of grandparents' motion for adoptive placement where district court found "there is a real risk of future emotional and developmental damage if the children are removed from the foster parents' home" (quotation omitted)); *with In re Welfare of D.L.*, 486 N.W.2d 375, 376-78 (Minn. 1992) (affirming grant of grandparents' adoption petition where district court found, based on

13

credible expert testimony, that the trauma associated with breaking the child's bond with their foster parents "would be temporary and . . . the child's sense of loss would diminish as new attachments are formed").

Here, both experts testified that separating J.J.R. from his foster parents would likely cause him substantial trauma. His therapist expressed significant concern that doing so would create a situation where J.J.R. would never regain "the same level of mental health" that he has now. In short, the record supports the district court's determinations that J.J.R. requires caretakers who are ready to meet his special needs, that further delays or moves would be detrimental, and that the secure attachment J.J.R. had formed with his foster parents should be protected. *See In re Welfare of J.R., Jr.*, 655 N.W.2d 1, 5 (Minn. 2003) (recognizing that delays in resolving child permanency proceedings create "uncertainty [that] can seriously and permanently damage a child's development of trust and security" (quotation omitted)). The law "leaves scant if any room" for this court to disturb a district court's weighing of the best-interests factors. *Vangsness v. Vangsness*, 607 N.W.2d 468, 477 (Minn. App. 2000). Based on our careful review of the record, we discern no abuse of discretion by the district court in determining that it is not in J.J.R.'s best interests to be placed with grandmother for adoption.

We recognize grandmother's love and concern for J.J.R. And we observe, as did the district court, that denial of grandmother's motion does not sever the grandparent-grandchild relationship. The foster parents have supported this relationship, and the district court gave "significant weight to the plan for [J.J.R.] to continue to have visitation and

14

contact with [grandmother], [R.F.], and [J.J.H.F.]." We commend the foster parents' stated intention to support these important relationships in the years to come.

## II.     Any error by the district court in determining that the county unreasonably failed to place J.J.R. with grandmother for adoption is harmless.

The county argues both that the district court improperly shifted the burden of proof at the evidentiary hearing and that it was not unreasonable to refuse to place J.J.R. with grandmother when her foster-care license was under investigation, which revealed concerns for grandmother's excessive alcohol use, mental health, and maltreatment. The GAL argues that the district court erred in granting the evidentiary hearing because grandmother (1) failed to file a proper motion for adoptive placement under Minn. Stat. § 260C.607, subd. 6, (2) failed to make a prima facie showing that the county was unreasonable in denying the requested adoptive placement, and (3) did not possess a valid adoption home study.

Because we discern no abuse of discretion in the district court's best-interests findings, we need not address these alternative grounds for affirming the district court's order, as any perceived error is harmless. *See* Minn. R. Civ. P. 61 (requiring harmless error to be ignored); *Katz v. Katz*, 408 N.W.2d 835, 839 (Minn. 1987) ("[W]e will not reverse a correct decision simply because it is based on incorrect reasons.").

**Affirmed.**

15